Merrimack
No. 2003-314

### THE STATE OF NEW HAMPSHIRE

v.

### DWAYNE HEARNS

Argued: May 14, 2004
Opinion Issued: July 15, 2004

*Peter W. Heed*, attorney general (*Susan P. McGinnis*, assistant attorney general, on the brief and orally), for the State.

*Dawnangela Minton*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

*Dwayne Hearns*, by brief, *pro se*.

GALWAY, J. The defendant, Dwayne Hearns, appeals his conviction on four counts of aggravated felonious sexual assault, RSA 632-A:2, I(j) (1) (Supp. 2003), and two counts of simple assault, RSA 631:2-a (1996). We affirm.

The jury could have found the following relevant facts. In the summer of 2001, F.B., a fourteen-year-old girl, was living with her mother in Maine. F.B. considered living with her mother difficult. Wanting to "get out of [her] mom's house," F.B. began working at the Circle Restaurant in

Epsom in June or July. The defendant, who had previously been married to F.B.'s mother, also worked at the restaurant and drove F.B. back and forth to work. Some nights after work, F.B. slept at the defendant's apartment in Pittsfield rather than returning home. On one such occasion, she alleged that the defendant committed two counts of simple assault against her.

On August 10, 2001, F.B. attempted suicide while at the defendant's house because she "didn't think [she] could handle another four years in [her] mom's house." F.B. then started to panic and hyperventilate, saying she did not want to return to her mother's house. The defendant encouraged her to talk to her mother about moving in with him, and he then took her to speak with her mother. Although F.B.'s mother initially refused to allow her to move in with the defendant, she ultimately told F.B. to collect her things and leave. F.B. then returned to Pittsfield with the defendant. She alleges that after she moved in with the defendant, he committed four counts of aggravated felonious sexual assault against her.

On appeal, the defendant argues that the trial court erred in: (1) granting the State's motion to compel him to provide blood and saliva samples for DNA analysis in violation of his privilege against self-incrimination; (2) denying his motion for a mistrial following improper comments made by the prosecutor during closing arguments; (3) improperly instructing the jury on the definition of "household member" utilized in RSA 632-A:2, I(j) (1); and (4) ruling that he could present alternative source evidence at trial only if he agreed to a continuance. We examine each of the defendant's arguments in turn.

## I. Self-Incrimination

The victim alleged that the last incident of aggravated felonious sexual assault occurred in the defendant's apartment, on a particular fitted bed sheet. Following the defendant's arrest, a search warrant was executed and the fitted bed sheet was recovered. An immunological test performed on that sheet revealed the presence of seminal material. Prior to trial, the State filed a motion to compel the defendant to provide blood and saliva samples for DNA analysis. The State sought DNA testing to determine whether the defendant was the source of that seminal material.

The defendant objected, arguing, among other things, that compelling him to furnish that evidence violated his privilege against self-incrimination guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution, as well as Part I, Article 15 of the New Hampshire Constitution. Following a hearing, the Superior Court (*McGuire*, J.) granted the State's motion.

On appeal, the defendant argues that the trial court erred in granting the State's motion to compel blood and saliva samples. The State argues, among other things, that this issue has not been preserved for appeal.

Assuming without deciding that the defendant's claim has been preserved, we first address the defendant's argument under the State Constitution, *State v. Ball*, 124 N.H. 226, 231 (1983), and cite federal opinions for guidance only. *Id.* at 232-33.

■ Part I, Article 15 of the New Hampshire State Constitution provides: "No subject shall . . . be compelled to accuse or furnish evidence against himself." We have previously recognized that "this privilege originated as a reaction to the practice in early English courts of compelling a witness to be sworn and give testimony concerning his guilt." *State v. Arsenault*, 115 N.H. 109, 112 (1975). Given this history, both "textwriters and the overwhelming majority of the courts have limited the scope of the privilege to . . . testimonial compulsion." *Id.* (quotations omitted). Like other jurisdictions, we have long said that the privilege against self-incrimination "applies only to evidence provided by a defendant that is of testimonial character." *State v. Cormier*, 127 N.H. 253, 255 (1985). The privilege, then, does not protect the accused "from compulsion which makes him the source of real or physical evidence." *Arsenault*, 115 N.H. at 112. For example, the privilege does not protect against "compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." *Cormier*, 127 N.H. at 256 (quotation omitted). "The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communications' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." *Schmerber v. California*, 384 U.S. 757, 764 (1966).

■ Other jurisdictions have held that like the examples provided above, DNA samples are non-testimonial in nature. *Shaffer v. Saffle*, 148 F.3d 1180, 1181 (10th Cir. 1998); *Boling v. Romer*, 101 F.3d 1336, 1340 (10th Cir. 1997); *Padgett v. Ferrero*, 294 F. Supp. 2d 1338, 1345 (N.D. Ga. 2003); *see also Johnson v. Commonwealth*, 529 S.E.2d 769, 779 (Va. 2000); *In the Matter of D.L.C.*, 124 S.W.3d 354, 374 (Tex. App. 2003); *Cooper v. Gammon*, 943 S.W.2d 699, 705 (Mo. Ct. App. 1997); *see also State v. Norman*, 660 N.W.2d 549, 557 (N.D. 2003). Because we too share that view, we conclude that compelling an accused to provide a DNA sample does not violate Part I, Article 15 of our State Constitution.

The Federal Constitution offers the defendant no greater protection than does the State Constitution under these circumstances. *United States*

*v. Hubbell*, 530 U.S. 27, 34 (2000); *Fisher v. United States*, 425 U.S. 391, 408 (1976). Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

The defendant contends that "the privilege against self-incrimination extends beyond evidence that is testimonial in nature." He first argues that the plain language of Part I, Article 15 protecting a subject from "furnish[ing] evidence against himself," unlike the language in the Federal Constitution, prohibits the compulsion of both testimonial and real evidence. He argues that because "furnish" means the physical relinquishment of something real or tangible, we should broaden the scope of our State's privilege to prohibit blood, urine and breath samples. We disagree.

"It is commonly held that the variety of constitutional or statutory phrasing neither enlarges nor narrows the scope of the privilege as developed in the common law." *Arsenault*, 115 N.H. at 112 (quotation omitted). As the United States Supreme Court has recognized:

> [A]s the manifest purpose of the constitutional provisions, both of the States and of the United States, is to prohibit the compelling of testimony of a self-incriminating kind from a party or a witness, the liberal construction which must be placed upon constitutional provisions for the protection of personal rights would seem to require that the constitutional guaranties, however differently worded, should have as far as possible the same interpretation.

*Schmerber*, 384 U.S. at 761-62 n.6 (quotation omitted). Therefore, these constitutional provisions, although worded differently, do not differ in scope to such a degree as the defendant contends.

The defendant next argues that the historical roots of the privilege require that both the State and Federal privilege be interpreted to prohibit compelled DNA testing. In particular, relying upon Justice Thomas' concurring opinion in *Hubbell*, 530 U.S. at 49 (Thomas, J. concurring), the defendant argues that the protection afforded by the federal self-incrimination clause may be broader than the United States Supreme Court asserts.

Contrary to the defendant's assertion, this Court has examined and utilized the historical roots of the privilege in defining its scope. *See Cormier*, 127 N.H. at 255; *see also Arsenault*, 115 N.H. at 112. Moreover, the historical analysis set forth in *Hubbell* is not as conclusive as the defendant suggests. *Hubbell*, 530 U.S. at 49-54 (Thomas, J. concurring). Justice Thomas concludes only that, "in light of the historical evidence that the Self-Incrimination Clause *may* have a broader reach than *Fisher*

holds, *I remain open to a reconsideration* of that decision and its progeny in a proper case." *Id.* at 56 (Thomas, J. concurring) (emphasis added). Justice Thomas, then, did not conclude that history mandates an expansion of the privilege beyond its present scope.

Finally, the defendant argues that United States Supreme Court precedent, particularly *Schmerber*, 384 U.S. at 757, is not controlling because the Supreme Court has not yet considered whether compulsory DNA testing violates the federal privilege against self-incrimination. Specifically, the defendant argues that *Schmerber* stood only for the proposition that a defendant could be compelled to provide blood samples for chemical analysis of blood-alcohol content without violating the Fifth Amendment. *See Schmerber*, 384 U.S. at 765. Because DNA can reveal information beyond that envisioned by *Schmerber*, such as private medical facts, he argues that *Schmerber* is not dispositive.

In *Schmerber*, the Supreme Court held that blood test evidence, "although an incriminating product of compulsion, was neither ... testimony nor evidence relating to some communicative act," and, therefore, does not violate the Fifth Amendment privilege against self-incrimination. *Id.* Most, if not all, of the courts which have addressed the intersection of DNA testing and self-incrimination have looked to *Schmerber* for guidance. *See, e.g., Cooper*, 943 S.W.2d at 705. We cannot ignore the distinction first drawn in that case between testimonial and physical evidence, nor can we disregard the specific facts of the case permitting the compulsion of blood test evidence—concepts similarly at issue here. *Schmerber*, 384 U.S. at 761. Therefore, we believe *Schmerber* appropriately guides our decision.

## II. Prosecutorial Misconduct

The defendant next argues that the Superior Court (*Fitzgerald*, J.) erred in denying his motion for a mistrial following three improper comments made by the prosecutor during closing arguments. In discussing F.B.'s testimony during closing arguments, the prosecutor stated: "She never wavered as to what that man did to her. Did you notice the defense didn't even cross-examine her on it? Why is that? Why?" Then, in discussing the testimony of the defense expert, the prosecutor stated: "They were just bringing him in here to say this because that's how it has to get in. Maybe they're bringing him in to say it because other people won't." Finally, at the conclusion of the argument, the prosecutor stated:

No one was there to protect [F.B.] from that man's manipulation and from that man's taking advantage of a situation. No one was there to protect her. But you are here now.

You can tell her by your verdict that you believe her, that what he did to her was a crime. You can tell him that you recognize this is a crime, you know what happened and you're not going to tolerate taking advantage of children in our society.

At the conclusion of the prosecutor's summation, the defendant objected. He argued that in commenting on his failure to cross-examine F.B. regarding certain aspects of her testimony, the State had improperly shifted the burden of proof. He also argued that the prosecutor's comments concerning the expert, as well as his comments on recognizing this type of activity as a crime were likewise improper. The defendant then requested a mistrial based upon the prosecutor's comments. Although the court did not rule on the defendant's request at that time, the judge did provide a curative instruction to the jury concerning burden-shifting. As for the remaining two comments made by the prosecutor, the court did not find them to be improper.

The defendant contends that the trial court erred in denying his motion for mistrial. He argues that because the "cumulative effect of the State's three improper arguments resulted in unfair prejudice incapable of cure," his request for a mistrial should have been granted.

Although the State argues that this claim is not preserved for appeal, we disagree. "To preserve an objection to closing arguments, counsel must raise it at the time the alleged improper statement is made, or within a reasonable time thereafter." *State v. Cote*, 143 N.H. 368, 374 (1999) (quotation omitted). We hold that objections raised immediately following the opponent's closing argument are made within a "reasonable time thereafter." *See id.* Here, the defendant objected immediately following the conclusion of the State's summation. While a contemporaneous objection may have been preferable, the objection was nonetheless timely.

"Mistrial is the proper remedy only if the evidence or comment complained of was not merely improper, but also so prejudicial that it constitutes an irreparable injustice that cannot be cured by jury instructions." *State v. Boetti*, 142 N.H. 255, 261 (1997) (quotation omitted). The trial court is in the best position to determine what remedy will adequately correct the prejudice created by a prosecutor's remarks, and absent an unsustainable exercise of discretion, we will not overturn its decision. *Id.*; *cf. State v. Lambert*, 147 N.H. 295, 296 (2001) (explaining unsustainable exercise of discretion standard).

As a threshold matter, we must determine whether the prosecutor's remarks amounted to impermissible comments. *State v. Ellsworth*, 151 N.H. 152, 155 (2004). If the prosecutor's remarks were impermissible, we

must then determine whether the error requires reversal of the verdict. *Id.*; *see Boetti,* 142 N.H. at 261. In making that determination, we balance the following factors: "(1) whether the prosecutor's misconduct was isolated and/or deliberate; (2) whether the trial court gave a strong and explicit cautionary instruction; and (3) whether any prejudice surviving the court's instruction likely could have affected the outcome of the case." *Ellsworth,* 151 N.H. at 155 (quotation omitted); *see State v. Turgeon,* 137 N.H. 544, 547-48 (1993) (applying similar factors).

In determining whether the prosecutor's comments were improper, we face the delicate task of balancing a prosecutor's broad license to fashion argument with the need to ensure that a defendant's rights are not compromised. *See State v. Wood,* 150 N.H. 233, 236 (2003). Here, the prosecutor's statement concerning the defendant's failure to cross-examine F.B. regarding aspects of her testimony constituted improper comment. "A defendant's decision not to testify or present evidence in his own defense can provide no basis for an adverse comment by the prosecutor." *State v. Fowler,* 132 N.H. 540, 545 (1989). The prosecutor's comment, then, improperly shifted the burden of proof onto the defendant. Like the trial court, however, we do not find the prosecutor's remaining comments to be improper.

Contrary to the assertion of the defendant, the prosecutor, in discussing the defendant's expert, did not improperly comment on facts not in evidence. After reviewing the videotape of the expert's testimony, we, like the trial court, cannot conclude that the prosecutor improperly commented on facts not in evidence. Rather, the prosecutor was drawing "reasonable inferences from the facts proven, and ha[d] great latitude in closing argument to both summarize and discuss the evidence presented to the jury." *State v. Vandebogart,* 139 N.H. 145, 160 (1994). Moreover, the prosecutor's comments urging the jurors to tell the victim that they believed her through their verdict was likewise acceptable. Nothing in the prosecutor's comments urged the jury to "send a message," nor did the prosecutor "play on the personal fears of the jurors concerning child molestation," as the defendant claims. Rather, the prosecutor simply urged the jury to do its job—determine whether the victim was credible and, therefore, whether the defendant was guilty.

Having found one of the prosecutor's comments to be improper, we must next determine whether a mistrial was warranted. *See Ellsworth,* 151 N.H. at 157. We do not believe it was. First, the prosecutor's comment was isolated; it was the only improper comment made. *See id.* Secondly, any prejudice produced by the prosecutor's comments was negated by the

court's curative instruction to the jury. *See id.*; *see also Boetti*, 142 N.H. at 261. The court specifically identified the improper comment, clarified that the defendant bore no burden, and re-explained the State's burden.

> Ladies and gentlemen of the jury, during the course of the State's argument in this case, an improper comment was made. The State argued that you should somehow consider defense counsel's failure to cross-examine [F.B.] on several issues. Please keep in mind that a defendant does not have to prove his innocence. A defendant has no obligation to introduce any evidence whatsoever. The burden of proof is on the State of New Hampshire to present evidence which convinces you beyond a reasonable doubt of the defendant's guilt on every element of the offense charged.

Finally, because the evidence of guilt was overwhelming, it is unlikely that any prejudice surviving the instruction affected the outcome of the case. *See Ellsworth*, 151 N.H. at 157-58. At trial, F.B. provided detailed testimony of the assaults, another witness testified that F.B. had told her about the assaults, and an expert in DNA collection and analysis testified that a sheet recovered from the defendant's apartment contained a mixture of DNA consistent with both the victim and the defendant.

Balancing the above factors, we cannot conclude that the trial court engaged in an unsustainable exercise of discretion in denying the defendant's motion for a mistrial.

### III. "Household Member"

#### A. Definition

Prior to the jury being instructed on the elements of the charges, the defendant asked the court to define "member of the same household"—one of the elements of aggravated felonious sexual assault, RSA 632-A:2, I(j) (1)—in accordance with RSA chapter 173-B (2002 & Supp. 2003). The court denied the defendant's request, ruling that "[RSA chapter] 173-B and its definitions are totally inapplicable to the circumstances at hand." Instead, the court relied upon a definition supplied by federal regulations for a number of different programs. Specifically, the court stated:

> One of the elements that I have just talked about is the fact that Dwayne Hearns was a member of the same household as the female juvenile. A household is a group of persons living in the same residence maintaining a single economic unit. Household members include any person who is a member of and participates and contributes to the maintenance of the household. Such a

definition may include children who are under parental-type control of a person other than a parent. Such a definition would not include a border [*sic*] or a tenant in a rooming house.

On appeal, the defendant contends that the "trial court erred when it denied [his] request to instruct the jury to use the definition of 'household members' contained in RSA 173-B:1." Relying upon RSA 173-B:1, X(a)-(b), he argues that the court should have instructed the jury that "household members" are:

(a) [S]pouses, ex-spouses, persons cohabiting with each other, and persons who cohabited with each other but no longer share the same residence.

(b) Parents and other persons related by consanguinity or affinity, other than minor children who reside with the defendant.

"Cohabit" is defined as living together as husband and wife.

The scope and wording of jury instructions is generally within the sound discretion of the trial court. *State v. Lamprey*, 149 N.H. 364, 366 (2003). Any allegations of error will be evaluated by interpreting the disputed instructions in their entirety, as a reasonable juror would have understood them, and in light of all the evidence in the case. *Id.* Reversal of a jury verdict is unwarranted when a jury charge fairly covers the issues and law of a case. *Id.*

The indictments in this case charged the defendant with violating RSA 632-A:2, I(j) (1). RSA 632-A:2, I(j) provides:

I. A person is guilty of the felony of aggravated felonious sexual assault if he engages in sexual penetration with another person under any of the following circumstances:

. . . .

(j) When, except as between legally married spouses, the victim is 13 years of age or older and under 16 years of age and:

(1) the actor is a *member of the same household* as the victim; or

(2) the actor is related by blood or affinity to the victim.

(Emphasis added.) Although the phrase "member of the same household" is not defined by the statutory scheme, we agree with the trial court that the defendant's proposed instruction was inapplicable.

■ First, subpart (a) of the defendant's proposed instruction is concerned with spouses. *See* RSA 173-B:1, X(a). On its face, however, RSA 632-A:2, I(j) specifically *excludes* spouses from its purview. Second, subpart (b) of the defendant's proposal, concerned with those "related by consanguinity or affinity, other than minor children," is likewise inapplicable. Consanguinity and affinity are directly addressed in RSA 632-A:2, I(j) (2). Because the defendant here was charged under RSA 632-A:2, I(j) (1), consanguinity and affinity cannot be the sole and determinative characteristics of household membership. Additionally, subpart (b) specifically excludes minor children. As RSA 632-A:2, I(j) (1) makes clear, the statute is aimed at protecting victims between the ages of thirteen and sixteen who are members of the same household as the accused. To exclude minor children from the definition of "members of the same household" would be antithetical to the very purpose of the statute. As such, the trial court did not err in refusing to give the defendant's proposed instruction.

Although the defendant further argues that the court should have defined "household" in accordance with its definition in BLACK'S LAW DICTIONARY—a definition he argues is "very similar to the one tacitly approved by this Court in past case law"—we disagree. We have not yet defined "member of the same household." *Cf. State v. Paglierani*, 139 N.H. 37, 38 (1994) (declining to determine whether trial court provided proper definition of "member of the same household" because defendant provided no specific grounds for objection and no alternative instruction). Moreover, the defendant has failed to explain why the definition set forth in BLACK'S LAW DICTIONARY is preferable to the one given by the court. Because the defendant has failed to demonstrate that the jury instruction in this case did not fairly cover the issues of law and fact, we cannot conclude that the trial court erred in giving its instruction. *See Lamprey*, 149 N.H. at 366.

### B. Sufficiency of the Evidence

At the close of the State's case, the defendant moved to dismiss based upon his proposed definition of "household member." Although he argued that the State had presented insufficient evidence that he and the victim were members of the same household, the court denied the motion. On appeal, the defendant now argues that the State presented no evidence that he and the victim were "parent and child or related by marriage or blood, no evidence that the complainant was subject to the parental-like control of the defendant, and no evidence that the two maintained a single economic unit, or participated and contributed to the maintenance of the household."

"In an appeal challenging the sufficiency of the evidence, the defendant carries the burden of proving that no rational trier of fact, viewing the evidence in the light most favorable to the State, could have found guilt beyond a reasonable doubt." *State v. Mason*, 150 N.H. 53, 56 (2003) (quotation omitted). "In reviewing the sufficiency of the evidence, we examine each evidentiary item in the context of all the evidence, not in isolation." *Id.* "Where the victim's testimony is sufficient to establish a *prima facie* case, no corroborating evidence is needed." *Id.*

■ Having reviewed the record, we conclude that sufficient evidence existed for the jury to find beyond a reasonable doubt that the defendant and the victim were members of the same household. The jury heard evidence that the defendant had previously been married to the victim's mother, that F.B. referred to the defendant as "Dad," and that when she was growing up, the defendant was around most of the time. Evidence was also presented that when F.B. was fourteen, she removed her things from her mother's house and started living with the defendant. The jury also heard testimony that while F.B. was living with the defendant, she worked only sometimes, while he worked fairly often, and that F.B. and the defendant looked for a new place to live together.

These facts, taken together, were sufficient for the jury to conclude that F.B. and the defendant were members of the same household.

*IV. Due Process*

On October 15, 2002, just days before trial was scheduled to begin, the defendant filed a motion to offer evidence pursuant to Superior Court Rule 100-A. In particular, the defendant sought to offer evidence concerning an alternative source of DNA found on sheets recovered from his apartment. During a hearing on the motion, the State indicated that it would need additional time to conduct analysis on the bedding and to prepare to question the defendant's witnesses. The court noted that it was "inclined to grant the State the time necessary if in fact the defense wished to proceed to offer evidence of possible alternative sources of DNA." The defense objected, arguing that the court was forcing the defendant to choose between his constitutional right to a speedy trial and his constitutional right to present all proofs favorable. The court ultimately ruled that:

> I've heard nothing to indicate that the evidence which the State was presented with at the last minute could not have been obtained earlier and presented to them in a timely fashion, not necessitating a continuance. But to maintain any sense of fairness to the State, they would have to have time to be entitled to rebut such evidence to fully investigate it. They were as well not aware

of the other witnesses who potentially would either corroborate or deny these matters. Therefore, if the defendant elects to proceed to trial as scheduled on Monday, the defendant will not be allowed to introduce evidence of potential alternative sources of DNA.

On appeal, the defendant contends that in forcing him to choose between two constitutional rights—his right to a speedy trial and his right to present all proofs favorable—the court denied him due process of law guaranteed by Part I, Article 15 of the New Hampshire Constitution.

In assessing a defendant's due process claim under the State Constitution, "we look to the principles of fundamental fairness." *State v. Graf*, 143 N.H. 294, 302 (1999). "To require a person to surrender one constitutional right in order to gain the benefit of another is simply intolerable." *Opinion of the Justices*, 121 N.H. 531, 540 (1981). Not every government-imposed choice in the criminal process that discourages the exercise of constitutional rights, however, is prohibited. *See id.* "Nevertheless, there are some choices which the State cannot require a defendant to make, and a choice between constitutional rights is one of them." *Id.* (citations omitted).

The court's ruling in this case did not deny the defendant due process. First, we find nothing fundamentally unfair about the adjudicatory procedure in this case. *See Graf*, 143 N.H. at 302. The defendant filed a motion to offer alternative source evidence pursuant to Superior Court Rule 100-A. That rule explicitly requires, in part: "Not less that forty-five (45) days prior to the scheduled trial date, any defendant who intends to offer evidence of specific prior sexual activity of the victim with a person other than the defendant shall file a motion setting forth . . . reasons that due process requires that he offer such evidence . . . ." SUPER. CT. R. 100-A. Here, although the defendant filed his motion with the court just days before the start of trial, the court did not deny his motion outright, as it otherwise properly could have done. Rather, the court indicated that it was willing to grant the defendant's request—effectively providing the defendant with greater protection than that to which he would otherwise be entitled—if he was willing to continue his trial to provide the State an adequate opportunity to prepare. In so ruling, the court did not create an unfair adjudicatory procedure, but rather properly balanced the fairness of granting the defendant's untimely request against the disruption that granting the request would have on the court system, *see State v. Cromlish*, 146 N.H. 277, 282 (2001), as well as the State.

Second, to the extent that any unfairness did occur, it was the result of the defendant's own actions. There can be little doubt that the allegedly

unconstitutional choice with which the defendant was presented was self-imposed. As the court found, the alternative source of evidence the defendant sought to introduce at trial could have been obtained and presented to the State much earlier, negating any need for a continuance. Having failed to disclose that evidence in a timely manner, *see* SUPER. CT. R. 100-A, the defendant cannot now seek constitutional shelter for his own actions. To permit such a result would itself be fundamentally unfair. *Cf. Graf*, 143 N.H. at 302 ("A fundamentally unfair adjudicatory procedure is one, for example, that . . . allows a party to reap the benefit of his own behavior in placing his opponent at an unmerited and misleading disadvantage." (quotation omitted)).

Accordingly, we affirm.

*Affirmed.*

NADEAU, DALIANIS and DUGGAN, JJ., concurred.