Hillsborough-northern judicial district
No. 2010-165

THE STATE OF NEW HAMPSHIRE

v.

MICHAEL MONCADA

Argued: March 10, 2011
Opinion Issued: April 28, 2011

*Michael A. Delaney*, attorney general (*Thomas E. Bocian*, assistant attorney general, on the brief and orally), for the State.

*Pamela E. Phelan,* assistant appellate defender, of Concord, on the brief and orally, for the defendant.

CONBOY, J. The defendant, Michael Moncada, appeals his conviction on three counts of aggravated felonious sexual assault (AFSA), ten counts of felonious sexual assault, and one count of bail jumping. *See* RSA 632-A:2 (Supp. 2010); RSA 632-A:3 (Supp. 2010); RSA 642:8 (2007). On appeal, he argues that: (1) the Trial Court (*Duggan,* J.) erred in finding him competent to stand trial; and (2) the Trial Court (*Smukler,* J.) erred in denying his motion to dismiss the AFSA charges for lack of sufficient evidence that he was a member of the same household as the victim. We affirm.

*I. Facts*

The record supports the following facts. The charges arose out of sexual contact between the defendant and A.G., the thirteen-year-old daughter of the defendant's girlfriend, Lisa W. (Lisa).

In early 2006, A.G., Lisa, and A.G.'s ten-year-old brother, M.W., lived in the Beech Hill apartment complex in Manchester. The defendant and his son, Anthony, lived in the same complex. Anthony and M.W. were friends. In May 2006, after a fire damaged the Beech Hill complex, A.G. and her family moved to an apartment on Cypress Street in Manchester. The defendant and Anthony had moved to an apartment on nearby Hayward Street, and the boys resumed their friendship. At the same time, Lisa became reacquainted with the defendant, and they began an intimate relationship. The defendant and Anthony began visiting Lisa's apartment every day.

After the school year ended, A.G. left to spend several weeks with her father in North Conway. While she was there, she and the defendant communicated through AIM, an Internet-based instant messaging service. During these communications, the defendant told A.G. that he loved her, that he wanted to spend the rest of his life with her, and that he wanted her to have his child.

Around the time A.G. left for North Conway, the defendant and Anthony began spending every night and eating their meals at Lisa's apartment. The defendant slept on the couch because he and Lisa had decided to keep the nature of their relationship from the children. Anthony and M.W. shared a futon in A.G.'s room. The defendant took the boys to day camp during the week, cooked or helped with the cooking at night, and for a period of time, drove Lisa to work in the morning and picked her up in the afternoon. Lisa testified that the defendant was "basically taking care of the kids," as she was often unavailable to supervise the children because of

her work schedule and her drug and alcohol use. However, the defendant retained and periodically visited his Hayward Street apartment.

A.G. returned from North Conway on a Friday at the end of July. That night, Lisa and the two boys went to bed at about 9:00. While the defendant and A.G. were alone, the defendant sexually penetrated A.G twice with his finger and once with his penis. On the following Sunday, A.G. accompanied her mother, the defendant, and the two boys to a flea market. There, A.G. looked at a gold necklace that had her name on it. The defendant proposed to Lisa that they split the $100 cost and buy the necklace for A.G. Lisa agreed, and the defendant made a down payment on the necklace.

The next day, Lisa went to work and the two boys went to summer camp. The defendant offered to drive A.G. to Hampton Beach, and she agreed. After spending an hour at Hampton Beach, they returned to Manchester where they spent some time at a public swimming pool. After they left the pool, the defendant was stopped by Manchester police. The reason for the stop was not disclosed to the jury because the trial court had issued a pretrial ruling precluding evidence of a complaint made to the police regarding the defendant's interaction with A.G. at the pool. The jury did, however, hear evidence regarding the defendant's interview later that day at the Manchester police station with Detective Brian Riel. Riel questioned the defendant about his relationship with A.G. The defendant denied any "inappropriate" contact with A.G. and told Riel that he had given her gifts because she "had a rough childhood and he was trying to be a father figure to her." After that day, the defendant and his son ceased spending their nights at A.G.'s apartment.

The defendant was subsequently indicted, and after the trial court found him competent to stand trial, the jury found him guilty of the fourteen charges. This appeal followed.

## II. Competency

Relying upon both the State and Federal Constitutions, the defendant argues that the trial court erred in finding him competent to stand trial. We first consider his argument under the State Constitution, using federal cases only to aid in our analysis. *State v. Ball*, 124 N.H. 226, 231-33 (1983).

Mental competence is a basic condition of a fair trial, and if a criminal defendant is legally incompetent then he or she has a constitutional right not to be tried. *State v. Gourlay*, 148 N.H. 75, 77 (2002). "The two-pronged test for competency requires that a defendant have: (1) a sufficient present ability to consult with and assist his lawyer with a reasonable degree of rational understanding; and (2) a factual as well as rational understanding of the proceedings against him." *Id.; see Dusky v. United States*, 362 U.S.

402 (1960); *State v. Haycock*, 146 N.H. 5, 6 (2001). The first prong of the test requires that the defendant be capable of communicating "meaningfully with his attorney so as to be able to make informed choices regarding trial strategy." *Gourlay*, 148 N.H. at 77 (quotation omitted). In order to have a "rational understanding" under the second prong, a defendant must have "sufficient contact with reality." *Haycock*, 146 N.H. at 6 (quotation omitted).

■ The State bears the burden to prove, by a preponderance of the evidence, that a defendant is competent to stand trial. *Id.* "The weight to be given testimony depends on the credibility of the witnesses, and the credibility of witnesses is for the trial court to determine." *Gourlay*, 148 N.H. at 78. Unless we find that no reasonable person could have come to the same conclusion as to the weight to be given to conflicting testimony, we will defer to the trial court. *Id.* When "a *prima facie* case of incompetency" is established through "uncontroverted expert testimony, the trial court should delineate its reasons for rejecting that testimony and those reasons must be supported by the record." *Haycock*, 146 N.H. at 8.

On appeal, the defendant argues that the State did not prove the first prong of the competency standard. He asserts that uncontroverted expert evidence established that he suffers receptive and expressive deficits that impaired his ability to sufficiently consult with and assist his lawyer with a reasonable degree of rational understanding. He argues that the trial court erred in ruling that he was competent and that a second defense attorney was not necessary to assist him during trial. He further asserts that, contrary to the requirement in *Haycock*, the trial court erred in failing to delineate specific reasons, supported by the record, for rejecting uncontroverted medical testimony. *See Lagway v. Dallman*, 806 F. Supp. 1322, 1338-39 (N.D. Ohio 1992) (holding a competency hearing to be procedurally insufficient where the judge substituted his own psychological expertise for that of the expert and the record was devoid of any explanation for his rejection of the expert's report).

Two experts testified at the June 30, 2009 competency hearing. They were Dr. James J. Adams, the State's forensic psychiatrist, and Dr. Eric Mart, a psychologist retained by the defense. Both agreed that the defendant has certain cognitive deficits.

Dr. Adams concluded that the defendant was "a psychiatrically normal individual," with an overall IQ in the "borderline intellectual functioning" range and a verbal IQ that might be in the "mentally retarded range." In Dr. Adams's opinion, the defendant's impediments inhibit his ability to process verbal material, especially spoken or written abstractions, and, therefore, he would not be able to understand and retain abstract explanations. For example, Dr. Adams did not believe that the defendant would

be able to understand and retain the concept of consent if he were given the explanation, "The victim is under 16 and therefore not able to consent to sexual activity." However, he suggested that the defendant might understand if he were told, "a girl under 16 doesn't get to say if she's going to have sex because she's too young. Her [parents] are in charge of her decisions, not her."

In his written report, Dr. Adams concluded:

> Because of the defendant's difficulties with abstractions[,] which are commonly used in courtrooms, this defendant requires accommodations in terms of time available to explain key issues which have been expressed in an abstract fashion. He would do better to have a pair of attorneys so that one attorney could sit by his side and monitor his understandings while the other attorney was speaking. With these provisos, it appears to me that this defendant is competent to stand trial in the current case.

Dr. Mart disagreed and concluded that the defendant was incompetent to stand trial. Although Dr. Mart agreed with Dr. Adams's overall diagnostic assessment, he believed that it would be difficult, if not impossible, for the defendant to follow the trial proceedings in a meaningful way. Dr. Mart reported that the defendant is "quite distractible" and that he "processes language very slowly," and concluded that the defendant's inability to follow courtroom proceedings was a greater impediment to his competence than his ability to understand the material.

At the hearing, in addition to Dr. Adams's testimony, the State offered the testimony of Tara Wright, the defendant's ex-girlfriend and mother of two of his children, and the testimony of Detective Riel. Tara Wright testified that she had never perceived that the defendant had problems understanding or following conversations and that she had observed him reading the newspaper when searching for jobs or apartments. She also testified that he participated in legal proceedings for the purpose of seeking termination of his child support obligation. He had also written her numerous letters from prison.

Detective Riel testified that when he interviewed the defendant in July 2006, he read the defendant his *Miranda* rights. The defendant indicated that he understood his *Miranda* rights and did not ask any questions about them. He was able to answer the detective's questions, though he evaded questions about having touched the victim inappropriately.

In concluding that the defendant was competent to stand trial, the trial court found that the "defendant is able to understand concepts when coupled with a concrete, rather than abstract, explanation," and that the defendant had a "rational understanding of the proceedings against him

and a sufficient present ability to consult and assist his lawyer with a reasonable degree of rational understanding." Further, the trial court stated, "While Dr. Adams recommended that a second attorney be appointed to represent the defendant, the court finds that the defendant's current attorney can explain the proceedings to the defendant beforehand, and as they unfold, so that the defendant will be able to understand the nature of the process."

■ The defendant argues that Dr. Adams's competency opinion "was conditioned on the appointment of a second defense attorney" and "necessarily rested on his determination that current counsel could not [sufficiently explain the proceedings to the defendant]." We disagree with the defendant's characterization of Dr. Adams's opinion. Nothing in Dr. Adams's report or his testimony indicates that his competency finding was specifically conditioned on the defendant having two attorneys. Indeed, at the hearing, Dr. Adams did not dispute the prosecutor's description of his comment as a "recommendation":

> A. Some people are, you know, deal with abstractions very well, like to think in abstractions. Many, many people prefer to be concrete. Concreteness is a quality, you know, which we ordinarily find in people who do concrete, simple work, mechanical work, that sort of thing. It's part of the range of human abilities, and I think this defendant has a low level of being able to do abstractions. But it's not in the mentally retarded range, and it's just one of his qualities.

> Q. Okay. And is that the basis for your recommendation that a second attorney be appointed to assist during the course of the trial to kind of explain what the abstract issues are to the defendant so he has a better concrete handle on what's going on?

> A. Yes. I thought that might help if there's an attorney kind of listening and watching him, and getting a sense of when he's not gathering something and inquiring about it. That might help him.

Thus, in Dr. Adams's opinion, the defendant was competent. He simply observed that the defendant might require extra time to consult with his attorney, and suggested that a second attorney might help to explain abstract issues during the course of trial. We do not conclude that anything in Dr. Adams's report or testimony contravenes the trial court's finding that the defendant's current attorney could adequately explain the proceedings to the defendant beforehand and as they unfolded. *See State v. Chen,* 148 N.H. 565, 568 (2002) (upholding a trial court's factual findings as supported by the record).

■ Further, because the trial court was not faced with uncontroverted medical evidence of the defendant's incompetence, there was no need for the trial court to delineate specific reasons for according more weight to Dr. Adams's opinion than Dr. Mart's. *See Gourlay*, 148 N.H. at 78 ("The weight to be given testimony . . . is for the trial court to determine." (quotation omitted)).

Given all the evidence on the competency issue, we cannot conclude that no reasonable fact finder could have found as the trial court did. Therefore, we defer to the trial court's determination that, in spite of his deficits, the defendant was competent and did not require a second attorney. *See id.* at 76 (affirming the trial court's finding that the defendant was competent despite the fact that both parties' experts agreed that the defendant suffered from cognitive impairment stemming from a self-inflicted gunshot wound to his head, long-term alcohol abuse, and a prior learning disability).

Because the State Constitution provides at least as much protection as the Federal Constitution under these circumstances, *see Gourlay*, 148 N.H. at 77; *Dusky*, 362 U.S. at 402, we reach the same result under the Federal Constitution as we do under the State Constitution.

## III. Sufficiency of the Evidence

The defendant was convicted on three counts of AFSA, stemming from his sexual penetration of A.G. on the night she returned from North Conway. To convict the defendant of these offenses as charged, the jury had to find that the defendant was a member of the same household as the victim. *See* RSA 632-A:2, I(j)(1) ("A person is guilty of the felony of aggravated felonious sexual assault if such person engages in sexual penetration with another person . . . [when] . . . the victim is 13 years of age or older and under 16 years of age and . . . the actor is a member of the same household as the victim."). At the close of the State's evidence, the defendant moved to dismiss the AFSA charges on the grounds that there was insufficient evidence that he was a member of A.G.'s household. The trial court denied the motion. On appeal, the defendant asserts that the trial court's ruling was legally erroneous.

■ To successfully challenge sufficiency of the evidence, a defendant must prove that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found guilt beyond a reasonable doubt. *State v. Evans*, 150 N.H. 416, 424 (2003).

■■ The term "household member" is not defined in the statute. The trial court did not define "household member" for the jury, but instead instructed that the term was "self-explanatory." We have previously

declined to define the term. *See State v. Hearns*, 151 N.H. 226 (2004); *State v. Paglierani*, 139 N.H. 37 (1994). In *Hearns*, we upheld the use of a jury instruction that stated:

> A household is a group of persons living in the same residence maintaining a single economic unit. Household members include any person who is a member of and participates and contributes to the maintenance of the household. Such a definition may include children who are under parental-type control of a person other than a parent. Such a definition would not include a [boarder] or a tenant in a rooming house.

*Hearns*, 151 N.H. at 234-35 (quotation omitted). The dictionary provides this definition of "household": "those who dwell under the same roof and compose a family: a domestic establishment; *specif*: a social unit comprised of those living together in the same dwelling place." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1096 (unabridged ed. 2002).

■ Having reviewed the record, we conclude that there was ample evidence that at the relevant time the defendant was a member of the same household as A.G. He participated in and contributed to the maintenance of the household. Both he and his son spent every night at A.G.'s home. The defendant was in an intimate relationship with A.G.'s mother, Lisa, and occasionally drove her to work. He cooked or helped with the cooking in the evening. The defendant's son slept in A.G.'s room, in the same bed as her brother. The defendant took the two boys to day camp in the mornings while Lisa was at work. Lisa testified that he was "basically taking care of the kids." He told Lisa that he would pay half the purchase price of a necklace for A.G. He took A.G. on an outing to Hampton Beach. The defendant told Detective Riel that he was trying to be a father figure to A.G. and had given her gifts because her father did not treat her well.

■ In arguing to the contrary, the defendant focuses on the facts that he and Lisa concealed the nature of their relationship from the children and that A.G. was absent from the home for most of the time that the defendant was staying there. We are not persuaded. The defendant and his son were nightly residents, not occasional visitors, at the Cypress Street apartment. Further, as we recognized in *Paglierani*, the short duration of a victim's presence in the household is not dispositive. *Paglierani*, 139 N.H. at 39. The victim in that case was a fifteen-year-old ward of the state who attended a boarding school and spent the Thanksgiving and Christmas holidays in the defendant's home. *Id.* at 38. We concluded that a reasonable jury could have

found that the victim was a member of the defendant's household because she was subject to parental-like control while with the defendant's family. *Id.* at 39.

In sum, we hold that there was sufficient evidence to support a conclusion, beyond a reasonable doubt, that the defendant and the victim were members of the same household.

*Affirmed.*

DALIANIS, C.J., and HICKS and LYNN, JJ., concurred.