NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-northern judicial district
No. 2017-0336
No. 2019-0071

THE STATE OF NEW HAMPSHIRE

v.

DANIEL TURCOTTE

Argued: October 23, 2019
Opinion Issued: July 1, 2020

Gordon J. MacDonald, attorney general (Elizabeth A. Lahey, assistant attorney general, on the brief, and Bryan J. Townsend, II, assistant attorney general, orally), for the State.

Stephanie Hausman, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.

HANTZ MARCONI, J. The defendant, Daniel Turcotte, was convicted following a jury trial in Superior Court (Kissinger, J.) on four counts of aggravated felonious sexual assault and five counts of felonious sexual assault, all involving a minor. See RSA 632-A:2, I (2007) (amended 2012 & 2018); RSA 632-A:3, II, III (2007 & Supp. 2012). The defendant directly appeals his convictions, arguing that the trial court erred by denying his motions for a mistrial based on (1) testimony about similar, uncharged acts and (2) prosecutorial misconduct during closing arguments. In a discretionary appeal which we have joined with his direct appeal, the defendant asserts that the

Superior Court (Abramson, J.) erred by denying his motion for a new trial based on the trial court's closure of the courtroom during closing arguments. We affirm.

## I. Motions for Mistrial

We first address the defendant's arguments that the trial court erred in denying his motions for a mistrial. A mistrial is appropriate when the circumstances indicate that justice may not be done if the trial continues to a verdict. State v. Wells, 166 N.H. 73, 76 (2014). To justify a mistrial, the conduct must be more than merely prejudicial; it must constitute an irreparable injustice that cannot be cured by jury instructions. Id.; see State v. Ayotte, 146 N.H. 544, 548 (2001) (explaining that "[t]he prejudicial effects of the inadmissible evidence must be such that the trial court cannot unring a bell once it has been rung" (quotation omitted)). When reviewing a trial court's ruling on a motion for a mistrial, we recognize that the trial court is in the best position to gauge the prejudicial nature of the conduct at issue and has broad discretion to decide whether a mistrial is appropriate. Wells, 166 N.H. at 76-77. We will not overturn the trial court's decision on whether a mistrial or other remedial action is necessary absent an unsustainable exercise of discretion. Id. at 77.

### A. First Motion for Mistrial

The defendant first argues that the trial court erred by denying his motion for a mistrial based on testimony of a detective who investigated the underlying charges against the defendant. At trial, the court ruled that the defendant's discussion with the detective about an incident involving the victim that occurred outside of Hillsborough County — the location of the underlying charges — was not admissible because it constituted "prior bad acts conduct." In accordance with the court's ruling, the State instructed the detective that she could not discuss a specific portion of her report about a prior bad act that took place in Salem.

The detective testified on direct examination that in her first interview with the defendant he admitted that he touched the victim's breasts and vagina, licked her vagina on more than one occasion, engaged in fellatio on more than one occasion, and had intercourse with her. The detective testified that in her second interview with the defendant he related specific information about acts involving the victim in Hillsborough including fellatio, and that the defendant stated that "during this time, he was giving her oral sex as well." She testified that the defendant also described having intercourse with the victim in Manchester.

On cross-examination, defense counsel sought to clarify whether the detective said that the defendant described performing oral sex on the victim in

2

Hillsborough.  The detective testified that the defendant "said he performed oral sex . . . he was vague on different accounts, but . . . I believe he said it was during that time as well. . . . I don't know specific dates, or times, or incidents, but in general --."  Defense counsel asked, "So it wasn't in Hillsborough?" and the detective answered, "I believe it was in Hillsborough."  Defense counsel then challenged that the detective's report did not include the defendant's admission that he performed oral sex on the victim in Hillsborough.  Defense counsel asked, "You don't report that [the defendant] said he had performed, himself, cunnilingus on [the victim] in Hillsborough?"  The detective replied, "It was discussed and I believe I'm not supposed to mention other locations?  So I don't know --."  Defense counsel asked to approach the bench, and before counsel did, the detective added, "It's kind of hard to address that without saying that."  The trial court immediately told the detective to stop talking.  Defense counsel moved for a mistrial and, before excusing the jury to discuss the motion with counsel, the court instructed the jury to disregard the detective's "last statement," saying, "It's to form no part of your deliberations in the case whatsoever.  I'm striking it in its entirety . . . ."

In support of the motion, defense counsel argued that the jury now knew that "this officer's not allowed to talk about other places, that there were other places, and for some reason she's not allowed to talk about it.  There's no way you can unring that bell with a curative instruction."  The court acknowledged the challenges of navigating testimony when the defendant had admitted to acts "that took place in multiple different counties over a long period of time."  The court noted that the question on cross-examination "was very specific about Hillsborough and then the answer was . . . in fairness to the witness . . . the uncertainty was whether or not the cunnilingus admission related to Hillsborough or some other place."  The court stated, "I think to ask the witness to have in mind every single location at every single admission . . . suggests to me that the witness was not trying to intentionally avoid the court's order."  The trial court denied the motion.

The parties then also discussed with the court the detective's testimony on direct that the defendant said cunnilingus occurred in Hillsborough, considering that the investigative reports did not specifically reflect that the defendant discussed cunnilingus happening there, but instead reflected that he said it happened multiple times in multiple places.  Therefore, defense counsel requested that the court strike the detective's more specific testimony and instruct the jury to disregard it.  Accordingly, once the jury returned, the trial court gave the following instruction:

> [T]here was some testimony from the detective about -- she specifically testified that the Defendant made an admission regarding the act of cunnilingus taking place in Hillsborough.  I am striking that testimony.  It's to form no part of your deliberations in this case whatsoever.  So just that portion of her testimony.

3

The defendant asserts on appeal that the detective's testimony "clearly conveyed that [the defendant] admitted to committing acts of cunnilingus in other locations that were not part of the evidence heard by the jury," thereby creating a high risk of prejudice due to "the similarity of the other acts" that could not be cured by the jury instruction given. We disagree.

"A mistrial based on the introduction of inadmissible evidence is warranted only when the challenged evidence causes irreparable injustice that cannot be cured by jury instructions." State v. Pandolfi, 145 N.H. 508, 512 (2000) (quotation omitted). "In this context, when deciding whether a defendant suffered irreparable injustice, we examine whether the inadmissible testimony unambiguously conveyed to the jury that the defendant had committed an act which was criminal in nature." Id. "The justification for a mistrial increases when the prior act identified is similar to the charged crime." Id.

Even assuming the detective's statements unambiguously conveyed evidence of the commission of prior bad acts in uncharged locations, prior to the detective's answer to defense counsel's question on cross-examination the jury had heard her uncontroverted testimony about the defendant's admissions that, on more than one occasion, he engaged in sexual conduct with the victim including fellatio, cunnilingus, and intercourse. In light of this uncontroverted evidence, we are not persuaded that the detective's subsequent testimony constituted an "irreparable injustice" that could not be cured by the court's immediate instruction to the jury that the statement was stricken and was to form no part of its deliberations, and its subsequent detailed instruction. See State v. Boetti, 142 N.H. 255, 259 (1997) (we presume that jurors follow the trial court's instructions). The trial court was in the best position to gauge the prejudicial effect of the detective's testimony implying that the defendant also admitted engaging in cunnilingus with the victim in an unnamed location. See State v. Kerwin, 144 N.H. 357, 359 (1999). Given our analysis, we deem the defendant's criticism of the sufficiency of the court's instructions to be without merit, and conclude that the trial court did not commit an unsustainable exercise of discretion in denying the defendant's first motion for a mistrial. See State v. Gaudet, 166 N.H. 390, 397-98 (2014).

B. Second Motion for Mistrial

The defendant next argues that the trial court erred in denying his motion for a mistrial based upon statements made by the prosecutor in his closing arguments. First, the prosecutor said, "So let's talk a little about the Defendant. Obviously, [defense counsel] has no choice but to say, you know, if you believe the detectives --." Defense counsel objected and, in a sidebar, argued that it was "an improper statement . . . to say that I have no choice but to," and he requested that the jury be "contemporaneously instructed that the fact there is no burden of proof whatsoever, that I don't have to concede

4

anything in this case." The prosecutor disagreed with defense counsel's characterization of his statement, explaining that he did not mean "that [defense counsel is] conceding anything" and that it was "a comment on the Defense, not a comment on his burden." The trial court did not disagree with the prosecutor as to his intent, but acknowledged that the statement did "suggest that [the defendant] has some burden" and, therefore, the court decided "to strike that comment and tell [the jury] to disregard it." Defense counsel requested "a contemporaneous instruction" and, accordingly, the trial court instructed the jury "to disregard the [s]tatement from the State regarding the Defense having no choice. . . . [T]he Defendant is under no obligation whatsoever, the State has the burden of proof, the charge is beyond a reasonable doubt, the Defendant is under no obligation whatsoever."

The prosecutor continued with his closing statement, telling the jury that he didn't want "in any way to suggest that the Defense has a burden. . . . [Defense counsel] is asking you to take a specific interpretation of [the] evidence and he has to, right?" Defense counsel again objected, and the trial court instructed the jury that "the Defense is under no obligation. I'm going to strike that last comment by the State. It's to form no part of your deliberations."

Second, defense counsel objected when the prosecutor said, "I think [the victim's] testimony, while difficult to follow and difficult for her to provide is reliable." The trial court sustained defense counsel's objection and, in a sidebar, the court told counsel that it was going to tell the jury "to disregard that" and it cautioned the prosecutor not to "inject [his] personal opinion." Defense counsel stated that he "would just like to make a record now, this is the second objection that would amount to prosecutorial misconduct in a closing argument," and he moved for a mistrial. The court denied the motion, saying that "[i]n the context of things, . . . it was . . . not intentional" on the part of the prosecutor, but that the court was going to strike it and also "go further in terms of a curative instruction." The trial court then told the jury that it was "going to strike the last comment by the State regarding . . . what an individual prosecutor thinks or believes. That's really not relevant, that's not part of any of your consideration in the case and it was improper for the Prosecutor to say that."

On appeal, the defendant argues that the prosecutor's "multiple improper arguments" were not isolated, suggest "deliberate misconduct," and were so prejudicial that they constituted an irreparable injustice that could not be cured by the jury instructions given. In addition, the defendant asserts that given the cumulative effect of the detective's testimony and the improper statements during closing argument, the trial court erred in denying his request for a mistrial. However, the defendant did not make this latter argument to the trial court and thus we deem it unpreserved for appellate review. See State v. Szczerbiak, 148 N.H. 352, 355 (2002).

5

"In examining claims of prosecutorial misconduct during closing argument, we face the delicate task of balancing a prosecutor's broad license to fashion argument with the need to ensure that a defendant's rights are not compromised in the process." Gaudet, 166 N.H. at 398 (quotation omitted). "A prosecutor may draw reasonable inferences from the facts proven and has great latitude in closing argument to both summarize and discuss the evidence presented to the jury and to urge them to draw inferences of guilt from the evidence." Id. at 399 (quotation omitted). "Mistrial is the proper remedy only if the evidence or comment complained of is not merely improper, but is so prejudicial that it constitutes an irreparable injustice that cannot be cured by jury instructions." Id.

Regarding the first set of challenged statements, the record supports the trial court's finding that the prosecutor did not intend to say that the defendant bore a burden of proof. To the extent the statements implied as much, the trial court struck the statements and immediately gave a curative instruction that "specifically identified the improper comment[s], clarified that the defendant bore no burden, and re-explained the State's burden." State v. Hearns, 151 N.H. 226, 234 (2004). Regarding the second statement, although observing that it was improper, the court again expressly found that the statement "was . . . not intentional." The trial court's curative instruction focused on the language that prompted the objection and directly corrected the prosecutor's misstatement. Although, as the defendant contends, the court could have used stronger language, when reviewing the sufficiency of a curative jury instruction in the context of a prosecutor's improper remark we give deference to the trial court's ruling, and we presume that jurors follow the trial court's instructions. Boetti, 142 N.H. at 259. Accordingly, we cannot say that the trial court unsustainably exercised its discretion when it denied the defendant's motions for a mistrial. See Gaudet, 166 N.H. at 404.

II. Motion for New Trial

The defendant next argues that the trial court erred by denying his motion for a new trial. He asserts that the fact that the trial court locked the courtroom for approximately 15 or 20 minutes during closing arguments violated his right to a public trial under the Sixth and Fourteenth Amendments to the Federal Constitution and Part I, Article 15 of the New Hampshire Constitution. The State counters that the trial court properly found that the courtroom closure was trivial and thus did not implicate the guarantees of the Sixth Amendment or Part I, Article 15. We first address the defendant's claim under the State Constitution and rely upon federal law only to aid in our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983).

Although the defendant requests that we adopt a new standard of review governing courtroom closures, we must first decide whether the courtroom "closure" here was sufficient to trigger the protections of the constitution. We

review the trial court's determination that the "closure" at issue was too trivial to so do in the context of the court's denial of the defendant's motion for a new trial. "A new trial may be granted in any case when through accident, mistake or misfortune justice has not been done and a further hearing would be equitable." RSA 526:1 (2007). Granting a motion for a new trial is within the discretion of the trial court, see Armstrong v. Armstrong, 123 N.H. 291, 293 (1983), and thus we review the court's decision for an unsustainable exercise of discretion, see State v. Lambert, 147 N.H. 295, 296 (2001).

At the defendant's sentencing hearing, defense counsel informed the trial court that he had learned after the trial that, unbeknownst to either defense counsel or the State, the courtroom was locked during a portion of the closing arguments. In response, the Trial Court (Kissinger, J.) explained:

> [T[here is a lot of case law that gives the Court the authority to how it manages the courtroom. The courtroom was open for the closings provided that people were here at the time that the closing started. At no time, did the Court shut the doors or lock the doors until after the closings had started and were underway. At that point, it is my view that it was critical that the jury -- jurors be able to see and watch counsel and their attention be focused on the arguments of counsel. And I have -- that is my practice. And I've done it for years. And there is authority supporting my ability to manage how I conduct the trials.

The defendant subsequently moved for a new trial based on the courtroom closure. In its order denying the motion, the trial court (Abramson, J.) found that

> [i]mmediately prior to closing arguments, the trial court . . . closed the courtroom to additional members of the public. Nobody already present in the courtroom was asked to leave, but the doors were locked to any additional viewers. At the time, the trial court did not notify either the State or defendant that it closed the courtroom. A friend of defendant who attended all three-days of the trial was briefly locked out of the courtroom when he tried entering after closing arguments had begun. After approximately 15-20 minutes, he was able to enter mid-way through closing arguments and observe the remainder of the trial.

(Record citations omitted.) Noting that "[m]any of the federal appellate courts . . . apply a 'triviality' exception, which recognizes that some closures are too trivial to amount to a violation of the Sixth Amendment," the court reasoned that such an exception applied to the circumstances of this case. (Quotation and brackets omitted.)

The Sixth Amendment provides in part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial." U.S. CONST. amend VI. Our State Constitution does not contain a similar clause, but Part I, Article 15 has been held to guarantee a defendant's right to a public trial. State v. Weber, 137 N.H. 193, 196 (1993); see Martineau v. Helgemoe, 117 N.H. 841, 842 (1977). The values furthered by the public trial guarantee include ensuring that the defendant "is fairly dealt with and not unjustly condemned," reminding the judge and prosecutor of their responsibility to the accused and the importance of their functions, encouraging witnesses to come forward, and discouraging perjury. See Waller v. Georgia, 467 U.S. 39, 46-47 (1984).

Under Waller, a trial court may close the courtroom without violating a defendant's public trial right when: (1) the party seeking to close the courtroom advances "an overriding interest that is likely to be prejudiced"; (2) the closure is "no broader than necessary to protect that interest"; (3) the trial court considers "reasonable alternatives to closing the proceeding"; and (4) the trial court makes adequate findings supporting the closure. Id. at 48; accord State v. Cote, 143 N.H. 368, 379 (1999). The defendant contends that these considerations were not met in this case because "no party sought closure of the courtroom"; rather, the trial court acted sua sponte and "nothing in the record supported an overriding or particularized concern that . . . this segment of trial would experience disruptions." Moreover, the defendant argues, the trial court "could have achieved its goal without violating [his] right to a public trial, by discussing a proposed limited closure with the parties," thereby "ensuring that all interested attendees were in the courtroom before closing arguments began." The defendant asserts that, given that the trial court "did not have a constitutionally sufficient reason for the closure," and because the violation of his right to a public trial constitutes a structural error, he must be granted a new trial.[1] See Weaver v. Massachusetts, 137 S. Ct. 1899, 1908, 1910 (2017) (explaining that "a violation of the right to a public trial is a structural error" and thus, "where there is an objection at trial and the issue is raised on direct appeal, the defendant is generally entitled to automatic reversal regardless of the error's actual effect on the outcome" (quotations omitted)).

The four-prong test set forth in Waller applies, however, "only if closing the courtroom implicates the defendant's Sixth Amendment right." United States v. Perry, 479 F.3d 885, 889 (D.C. Cir. 2007). There is a "uniform line of authority holding that a courtroom closure that is determined to be trivial does not meaningfully infringe upon the values protected by the right to a public trial." State v. Telles, 446 P.3d 1194, 1199 (N.M. Ct. App. 2019). This line of

---

[1] Because we conclude that the courtroom closure in this case did not implicate the defendant's constitutional right to a public trial, we need not address his argument that the closure was a structural error thereby requiring automatic reversal and a new trial.

authority "looks . . . to whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant—whether otherwise innocent or guilty—of the protections conferred by the Sixth Amendment." Peterson v. Williams, 85 F.3d 39, 42 (2d Cir. 1996); see, e.g., Carson v. Fischer, 421 F.3d 83, 85, 93 (2d Cir. 2005) (determining that the trial court's decision to exclude the defendant's ex-mother-in-law from a limited portion of the trial despite the court's failure to make particularized findings did not implicate the values underlying the Sixth Amendment); United States v. Ivester, 316 F.3d 955, 958 (9th Cir. 2003) (explaining that before applying the Waller test, the court must first determine whether the Sixth Amendment public trial right attaches); Snyder v. Coiner, 510 F.2d 224, 230 (4th Cir. 1975) (concluding that a brief, temporary closure of the courtroom to additional spectators during closing arguments was too trivial to amount to denial of the public trial right); State v. Lindsey, 632 N.W.2d 652, 660-61 (Minn. 2001) (explaining that not all courtroom restrictions implicate a defendant's right to a public trial).

As the trial court found under the facts of this case: (1) "[t]here does not appear to have been any intention by the trial court to purposely exclude the public from defendant's trial"; (2) the court's "reasoning for closing the courtroom was to minimize distraction while counsel for both parties presented their final arguments to the jury"; (3) "members of the public were actually present during closing arguments and the courtroom was otherwise open to the public at every stage of the proceeding"; (4) although "one of defendant's supporters was briefly excluded from closing arguments, this [did] not alter the overall public nature of the proceedings as they were actually conducted"; and (5) "the presence of the public during all portions of defendant's trial sufficiently safeguarded the core protections intended by the Sixth Amendment." See Snyder, 510 F.2d at 230 (where a bailiff temporarily refused to allow persons to enter or exit the courtroom during closing arguments in order to minimize disturbances but allowed previously admitted spectators to remain, court deemed the closure "entirely too trivial to amount to a constitutional deprivation"); People v. Woodward, 841 P.2d 954, 959 (Cal. 1992) (en banc) (employing a "de minimis rationale" to courtroom closure during counsels' closing arguments that permitted existing spectators to remain, "did not include any of the evidentiary phase of the trial and lasted only one and one-half hours"); cf. Gibbons v. Savage, 555 F.3d 112, 117 (2d Cir. 2009) (explaining that "when the trial judge ordered the courtroom closed to all spectators, the courtroom was closed within the meaning of the Sixth Amendment," thereby requiring a Waller analysis to evaluate whether the closure was justified).

We are persuaded by the reasoning of courts in other jurisdictions that certain temporary closures of the courtroom during closing arguments are too trivial to amount to a denial of the defendant's public trial rights and, thus, we adopt a triviality analysis under Part I, Article 15 of the State Constitution. Accordingly, we conclude that the trial court did not unsustainably exercise its

9

discretion in denying the defendant's motion for a new trial because "the brief closure of the courtroom during closing arguments was too trivial to undermine the public nature of defendant's trial."  In this area, the Federal Constitution provides no greater protection than the State Constitution.  See Cote, 143 N.H. at 378.  Therefore, we reach the same conclusion under the Federal Constitution.

We observe, however, that the practice of locking the courtroom doors may create the appearance that our courtrooms are not open to the public, see State v. Brown, 815 N.W.2d 609, 618 (Minn. 2012), and "runs the risk of violating the Sixth Amendment and, accordingly, of requiring a new trial." Braun v. Powell, 227 F.3d 908, 920 (7th Cir. 2000).  Trial courts should, therefore, lock courtroom doors only on rare occasions, preferably with the court expressly stating on the record the reasons for doing so.  See Brown, 815 N.W.2d at 618.

Affirmed.

HICKS, BASSETT, and DONOVAN, JJ., concurred.

10