**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| J.J.K. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| N.E.K. | : | |
| | : | |
| | : | No. 940 MDA 2020 |

Appeal from the Order Entered June 12, 2020
In the Court of Common Pleas of Lancaster County Civil Division at
No(s):  CI-15-06455

BEFORE:   STABILE, J., NICHOLS, J., and STRASSBURGER, J.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED MAY 13, 2021**

J.J.K. (Father) appeals *pro se*[1] from the order that denied his petition to modify the existing custody order with respect to his sons, J.A.K., born in April of 2008, and J.R.K., born in March of 2010 (collectively, the Children).  For the reasons that follow, we vacate the trial court's no-alcohol provision as it applies to Father, but otherwise affirm.

By way of background, the record reveals that the Children were born during the marriage of Father and N.E.K. (Mother).  The parties separated in July of 2015, and they subsequently divorced.  Protracted custody litigation ensued.  Relevant to the instant matter, Father and Mother have had shared

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Father is a licensed attorney.  Trial Ct. Op., 6/12/20, at 2.

legal and physical custody of the Children since their separation. The existing custody order, which was dated September 11, 2017, and entered on September 13, 2017, granted custody to Father every Monday until Wednesday, and Mother every Wednesday until Friday. The order directed that the parties alternate weekend custody, which the order defined as Friday until Monday. Order, 9/11/17, at ¶¶ I–II.

In 2018, Father remarried, and he and his wife have a son, who was thirteen months old at the time the subject proceeding. Trial Ct. Op. at 2; N.T., 6/2/20, at 62. Father has lived in his current home since 2018, and Mother has resided in her home since the parties' separation.[2] Trial Ct. Op. at 2.

On September 18, 2019, Father filed the underlying *pro se* petition to modify the existing custody order. Father alleged, in part:

> [J.R.K., the parties' younger son,] had made suicidal statements to Mother approximately two weeks prior. . . . [O]n September 13, 2019, J.R.K. had gone to the kitchen at Mother's home and held a knife to his heart. J.R.K. communicated to Father that he has been upset because Mother is never home and that she does not do anything with them when she is home. . . .

Pet., 9/18/19, at ¶ 5(A). Further, Father alleged that "[s]ince at least June of 2018, Mother has routinely left the [C]hildren home unsupervised for extended periods during both the daytime and evening hours, for various reasons, including social occasions." *Id.* at ¶ 5(B). In addition, Father

_____

[2] It is not clear whether Mother lives in the former marital residence. Father and Mother live in the same school district.

asserted that "[i]n June of 2019[,] the [C]hildren reported that Mother let J.R.K. sit on her lap and steer the car for an extended period of time after Mother had '5 or 6' vodka drinks and was 'acting like she had no idea what was going on.'" *Id.* at ¶ 5(C).

The trial court appointed Jeffrey S. Shank, Esq. as the Children's guardian *ad litem* (GAL) on September 30, 2019. The GAL prepared a report with a recommendation that "the shared schedule continue." GAL Report, 4/15/20, at 9.

Following delays caused by court emergency closings due to the COVID-19 pandemic, the trial court held an evidentiary hearing on June 2, 2020, at which Father represented himself. Father then testified with respect to his request for primary physical custody.

Father also called the Kim Thvedt a "psych[] liaison" who performed a psychosocial assessment of J.R.K. on September 17, 2019, when Father took J.R.K. to the emergency room after learning of J.R.K.'s suicidal ideations. Ms. Thevdt testified by telephone that she had a "nice conversation" with J.R.K. regarding what was going on in his life. N.T., 6/2/20, at 177. She further explained:

> [J.R.K.] denied suicidal and homicidal ideations. He did admit that he h[el]d his knife to his chest with a plan to kill himself the Friday before. He states that he did this while [M]other was in the shower. She was getting ready to go out without him and his brother.
>
> He states that he started having thoughts like this about a month previous to this visit [to the emergency room], states he sometimes felt that he was not a good person but that holding the

- 3 -

knife to his chest scared him. He says he did it. He did this because [Mother] is never home. . . . [He] says he feels [Mother] does not love him; that she goes out all the time without him and she doesn't spend time with him.

*Id.* at 177–78. Ms. Thvedt stated that J.R.K. also discussed Mother's drinking and an incident where she had him steer her car after she had been drinking. *Id.* at 180. Ms Thvedt testified that she gave a report of "alleged" child abuse to ChildLine. *Id.* at 190.

The trial court separately interviewed the Children *in camera* in the presence of the GAL. The older child, J.A.K., was twelve years old at the time of the hearing and testified that he preferred "to spend more time with [Father] . . . ." N.T., 6/2/20, at 126. J.A.K. explained:

[Father] just, you know, interacts with us so much more and it seems so much more fun and I feel like I'm in so much more bad moods when I'm at [Mother's]. It's like, [J.A.K.], do you want to go do something? Not really. But at [Father's], [J.A.K.], do you want to go play basketball? Oh, yeah, sure.

THE COURT: What do you think the difference is? Why do you say, yes, when [Father] asks you to do something?

[J.A.K.]: Because I feel just like when [J.R.K.] or [Mother] ask me to do something, it's just kind of like—I'm going to rephrase that. We're just kind of there so much, and we're not really together at all. And I'll just be, like, laying in my bed and [J.R.K.] will be like, [J.A.K.], do you want to go someplace? No, not really. When I with [Father], we're up and moving and doing stuff. And it's like, you guys want to go on a walk and play basketball? Sure, whatever.

*Id.* at 126–27.

J.R.K., then ten years old, testified with respect to his custody preference as follows:

> THE COURT: Right now you're spending about half your time at your dad's house and half the time at [Mother's] house. How do you feel about that schedule?
>
> [J.R.K.]: I like it.
>
> THE COURT: So you wouldn't want to ever see that change?
>
> [J.R.K.]: No.

*Id.* at 154. Both J.A.K. and J.R.K. testified that they want to remain together and not be separated with respect to any custody schedule. *Id.* at 135, 155.

Mother testified on her own behalf. In addition, the GAL testified regarding his recommendation not to change the custody schedule. The GAL testified, "I think the parents should have an equal amount of time because I think they both have a lot to offer and their kids are doing—overall they're doing very well." *Id.* at 55.

By order dated June 11, 2020, and entered on June 12, 2020, the trial court maintained the shared legal and physical custody schedule between Father and Mother. The trial court granted custody to Father every Monday until Wednesday, to Mother every Wednesday until Friday, and to both parties on alternating weekends. The order included a no-alcohol provision, which stated that "[n]either party shall consume alcohol while the Children are in his or her custody or for the twelve hours before that parent's custodial period . . . ." Order, 6/12/20, at ¶ VI(A).

In its opinion accompanying the order, the trial court listed and considered all of the Section 5328(a) best interest factors. Trial Ct. Op. at 5-8. The trial court found inapplicable Section 5328(a)(15) and (16). The trial court found that Section 5328(a)(6), the child's sibling relationships, "slightly favors Father" due to the Children's half-brother who resides with Father. *Id.* at 6. The trial court found that the remaining best interest factors favored neither party. *Id.* at 5-8.

In maintaining the shared physical custody schedule, the trial court found determinative Section 5328(a)(4), the need for stability and continuity in the child's education, family life and community life, and Section 5328(a)(9), which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs. The trial court reasoned, "Mother and Father have [had] shared physical custody of the Children since their separation[,] and the Children are doing well under the current schedule." *Id.* at 6. In addition, the trial court reasoned, "The Children feel comfortable talking to both parents and both parents recognize the importance of addressing the Children's emotional needs." *Id.* at 6–7.

On July 10, 2020, Father timely filed a *pro se* notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court filed a Rule 1925(a) opinion adopting its prior opinion. The trial court further explained that while it took "into

account what the Children [said]," it did not consider the Children to be "fact witnesses." Rule 1925(a) Op., 8/6/20, at 2, 6. Specifically, the trial court acknowledged:

> The Children spoke credibly about what they had perceived and felt, but the court was not required to agree with the Children's assumptions, such as a belief that if Mother was acting weirder than she normally was in the morning after spending time with friends, it meant she had been she had been drinking.

*Id.* at 6 (record citation and quotation marks omitted).

On appeal, Father raises thirteen issues, which we have reordered as follows:

1.   Whether the [t]rial [c]ourt erred and abused its discretion by stating, for the first time, in its 1925([a]) opinion that the Children were not testifying as fact witnesses?

2.   Whether the [t]rial [c]ourt erred and abused its discretion by disregarding all statements made by the Children regarding Mother's behaviors during *in camera* testimony, despite the [c]ourt stating on the record, after speaking with [the] Children, that it had major concerns regarding Mother, that the Children were very credible and had no reason to lie?

3.   Whether the [t]rial [c]ourt erred and abused its discretion by placing more weight on Mother's post-filing behavior than her pre-filing behavior, where it took 9 months from the time of filing until trial due to no fault of Father's, and where [J.A.K.] indicated that Mother told him many of her behavior changes post-filing were because her attorney told her to spend more [time] with the Children?

4.   Whether the [t]rial [c]ourt erred and abused its discretion by placing too much weight on the report of the [GAL]?

5.   Whether the [t]rial [c]ourt erred and abused its discretion in analyzing factor 2 by concluding that neither party presented evidence of abuse where the Children credibly

testified as to specific incidents with Mother that scared them?

6. Did the [t]rial [c]ourt err[] and abuse[] its discretion by concluding that [f]actor 6, sibling relationships, only "slightly favors Father", where the Children have a half-brother at Father's and no other siblings at Mother[']s?

7. Whether the [t]rial [c]ourt erred and abused its discretion by making no conclusion as to [f]actor 7, despite [J.A.K.] credibly stating reasons he wished to live with Father, and despite testimony from emergency room personnel and [J.R.K.] regarding the reasons he made statements of self-harm to Mother and ultimately held a knife to his heart with a "plan to kill himself" at Mother's home?

8. Whether the [t]rial [c]ourt erred and abused its discretion in analyzing [f]actor 8, where the [c]ourt found no evidence one parent disparages the other, despite admittedly credible testimony from [J.A.K.] on the record stating that Mother disparaged Father directly to [J.A.K], which caused [J.A.K.] to run away from Mother's home for nearly 2 hours?

9. Whether the [t]rial [c]ourt erred and abused its discretion in analyzing [f]actor 13 regarding communication and cooperation between the parents by disregarding several of Mother's actions, including Mother's failing to inform Father of [J.R.K.]'s statement of self-harm?

10. Whether the [t]rial [c]ourt erred and abused its discretion in finding factor 14, regarding alcohol abuse, did not weigh in favor of one party over the other, and by failing to address how Mother's excessive drinking has impacted the Children, despite credible evidence from the Children that Mother has had a history of problematic alcohol consumption, has driven drunk with [J.R.K.] on her lap steering the car, that one of the reasons that prompted [J.R.K.] to hold a knife to his heart "with the plan to kill himself["] was due to Mother "always being drunk", and where the [c]ourt found that Mother's testimony regarding alcohol consumption was not credible?

11. Whether the [t]rial [c]ourt erred and abused its discretion in concluding [f]actors 4, 9, 10, and 12 do not favor one

party over the other, and finding specifically with regard to [f]actor 12 that Mother only occasionally left the Children home alone for short times, where the record contains ample evidence of Mother[] leaving the Children home alone routinely to attend social events starting when the [C]hildren were ages 10 and 8?

12. Whether the [t]rial [c]ourt erred and abused its discretion by placing a "no alcohol" condition on Father, despite finding that Father rarely consumes alcohol in front of [the] Children, while noting that Mother's drinking has been problematic?

13. Whether the [t]rial [c]ourt erred and abused its discretion by awarding shared physical custody to both parents where such an award is not supported by the record?

Father's Brief at 19–22.

We review Father's issues according to the following scope and standard

of review:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

> ***R.M.G., Jr. v. F.M.G.***, 986 A.2d 1234, 1237 (Pa. Super. 2009) (quoting ***Bovard v. Baker***, 775 A.2d 835, 838 (Pa. Super. 2001)). Moreover,

> [O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

- 9 -

> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*R.M.G., Jr., supra* at 1237 (internal citations omitted). The test is whether the evidence of record supports the trial court's conclusions. *Ketterer v. Seifert*, 902 A.2d 533, 539 (Pa. Super. 2006).

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014).

In addition,

> [i]t is not this Court's function to determine whether the trial court reached the "right" decision; rather, we must consider whether, "based on the evidence presented, given due deference to the trial court's weight and credibility determinations," the trial court erred or abused its discretion in awarding custody to the prevailing party. *Hanson v. Hanson*, 878 A.2d 127, 129 (Pa. Super. 2005).

*King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005).

The primary concern in any custody case is the best interests of the child. "The best interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral[,] and spiritual well-being." *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006) (citation and quotation marks omitted).

Child custody actions are governed by the Child Custody Act ("Act"), 23 Pa.C.S. §§ 5321-5340. Section 5328(a) of the Act provides the following enumerated list of factors a trial court must consider in determining the best interests of a child when awarding any form of custody:

**§ 5328. Factors to consider when awarding custody.**

**(a) Factors.—**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a).

This Court has stated that, "**[a]ll** of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." *J.R.M. v. J.E.A.,* 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original). Further,

Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.[] § 5323(d). Additionally, "section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen Section 5328 custody factors prior to the deadline by which a litigant must file a notice of appeal." *C.B. v. J.B.,* 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, [70 A.3d 808 (Pa. 2013)]. . . .

In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.,* 63 A.3d 331, 336 (Pa. Super. 2013), *appeal denied,*[68

A.3d 909 (Pa. 2013)]. A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d). *Id.*

*A.V.*, 87 A.3d at 823.

### Issues 1 to 4: Failure to Consider the Children's Testimony and Improperly Weighing the GAL Report

Turning to Father's arguments on appeal, we address his first four issues together. In each, Father asserts that the trial court erred in its consideration of the evidence supporting the reasons he filed the petition to modify custody. Specifically, Father extensively discusses (1) Mother's drinking, (2) the two incidents when Mother was driving with the Children, (3) J.R.K.'s suicidal gesture, and (4) Mother's leaving the Children at home alone.

In his first issue, Father challenges the trial court's statement in its Rule 1925(a) opinion that the trial court did not regard the Children as fact witnesses regarding Mother's conduct. Father's Brief at 35. Father notes that the trial court failed to reference any of the Children's testimony regarding the incidents that prompted him to file the petition to modify custody. *Id.* at 33-35. Specifically, Father notes that the Children corroborated his reasons for seeking a modification based on (1) J.R.K.'s suicidal thoughts and threat, (2) Mother's "several drunk driving incidents" with the Children present, which included one instance in which she vomited and another incident where she had J.R.K. steer but refused his request to slow down or stop the car, and (3) Mother's leaving the Children home alone. *Id.* Father adds that the trial court

stated at the hearing that it found Children's accounts credible with respect to Mother's abuse of alcohol. *Id.* at 35.

In his second issue, Father argues that the trial court abused its discretion in disregarding the Children's testimony despite "stating on the record, after speaking with [the] Children, that it had major concerns regarding Mother, that the Children were very credible and had no reason to lie." *Id.* at 54. Father, referring to his first issue, asserts he demonstrated how the trial court "abused its discretion and committed an error of law by not treating the Children as fact witnesses or by disregarding all the statements made by the Children." *Id.*

In his third issue, Father argues that the trial court abused its discretion in placing weight on Mother changing her behavior during the pendency of this case, despite J.A.K.'s testimony that she did so upon advice of counsel. *Id.* at 55. Father states:

> Any party awaiting a final custody hearing would be foolish to not at least partially change their behaviors that were the impetus for a filing of a custody action, or in this case a custody modification. Mother, however, stated directly to [J.A.K.] that she was spending more time with the Children because her[] lawyer said she had to. Despite relying heavily on Mother's "post-filing" behavior, the [trial c]ourt completely omits this statement from [J.A.K.].

*Id.* Father criticizes the trial court for suggesting that delay in filing of the petition to modify custody and in holding the hearing due to COVID-19-related issues "may have provided Mother with time to change her behaviors, which

perhaps Father would not have preferred." *Id.* at 56 (citation and quotation marks omitted).

In his fourth issue, Father asserts that the trial court erred in relying on the GAL report and testimony. According to Father, the GAL asked very little of Mother and the Children "about the facts that led to Father's filing. Additionally, the [c]ourt's reliance was too heavy where the Children testified to the [c]ourt in a credible manner, in which the Children validated many of Father's concerns." *Id.* at 58. Father further contends that "it is clear Mother was inconsistent in her interviews with [the GAL], much as she was during the Custody Hearing." *Id.* at 57.

By way of background, in his report, the GAL stated that he met with the Children on October 14 and 31, 2019, November 26, 2019, and that he spoke with them in March of 2020. GAL Report, 4/15/20, at 1, 6–7. Further, the GAL testified that he also spoke with the Children on May 28, 2020. N.T., 6/2/20, at 5. In addition, the GAL stated that he met with Father and Mother separately in October of 2019, and with Father again on November 26, 2019. GAL Report, 4/15/20, at 1, 6. The GAL also spoke with Father and Mother in March of 2020. *Id.* at 7.

As to Mother's drinking, the GAL testified that, after speaking with Mother, he "had the impression that [Mother] consumed alcohol . . . at a social level when she was out with friends." N.T., 6/2/20, at 21. The GAL testified, based on speaking with the Children regarding the same subject:

I don't have any information to allow me to conclude the quantity or the frequency of the alcohol consumption. I can only report that the [Children] told me that at times it was going on[,] and it was scary to them[,] and they had the impression that their mom had too much to drink. I don't know that I have that same impression from [Mother], and I can't gauge factually. I can only report.

*Id.* at 22.

On cross-examination by Father the GAL clarified, "I have no means or mechanisms to evaluate how many drinks she has a day or a week. . . ." *Id.* at 31. When Father asked whether Mother had recently been consuming alcohol to excess, the GAL noted that "[J.A.K.]'s exact words to me were, [']it's not happening.[']" *Id.* at 37.

The GAL stated that Mother acknowledged allowing J.R.K. to steer her car. However, the GAL noted that Mother stated that the incident occurred "when in the neighborhood and near home of less than a mile, she has allowed [J.R.K.] to sit on her lap and 'steer' the car while confirming she is fully in control and indicates that this may occur a few times a year." GAL Report, 4/15/20, at 4.

The trial court examined Children *in camera*, after it heard testimony from the GAL and Father, but before Mother testified. With respect to Mother's drinking and risky behaviors and their effect on the Children, J.A.K testified about (1) observing Mother drinking vodka at home and being "drunk," and (2) the incident in which after Mother "had a lot of drinks [and] we got in the car, and . . . she let [J.R.K] sit on her lap and drive us home[,] and she was

- 16 -

stepping on the pedal for fun, like speeding a lot." N.T., 6/2/20, at 129-32.

J.A.K. further testified that "this was a while ago, but [Mother] puked out the side of the car."[3] *Id.* at 130.

> J.A.K. further testified as follows:
>
> THE COURT: [Is there] anything else at [Mother]'s that made you feel uncomfortable?
>
> [J.A.K.]: [Mother] has said things like she said before, if I had it my way, you wouldn't even be around—or, like, if I had it my way, I wouldn't even spend time with you. And she also said things like, I'm only spending time with you because my lawyer said I had to.
>
> THE COURT: How long has she said things like that?
>
> [J.A.K.]: About a month ago, a couple months ago.
>
> THE COURT: So not too long ago?
>
> [J.A.K.]: No.

*Id.* at 129.

With respect to J.R.K.'s alleged suicidal ideation in September of 2019, J.R.K. testified in the following exchange with the trial court:

> THE COURT: It was last year you went through a little bit of a rough time or part time . . . at [Mother's] house?
>
> * * *
>
> Do you remember that?
>
> [J.R.K.]: Yes.

_____

[3] Mother testified regarding the occasion when she vomited outside the car. She testified that she vomited due to her medication for Cushing's disease, which involves tumors that grow on the pituitary gland. N.T., 6/2/20, at 171. Mother did not inform the Children of her medical condition. *Id.*

THE COURT: What was going on there?

[J.R.K.]: Like, I kind of felt like she didn't love me that much; but after that incident, I feel refreshed about it.

THE COURT: What made you feel, first of all, that she didn't love you as much?

[J.R.K.]: She was drinking a lot.

\* \* \*

And, . . . she was going out with her friends. But that's really stopped.

THE COURT: And when she would go out with her friends, would you stay with someone, or would you be alone?

[J.R.K.]: Alone.

THE COURT: You and [J.A.K.]?

[J.R.K.]: Yeah.

THE COURT: And how did you know she was drinking?

[J.R.K.]: She was just acting weirder than she normally was in the morning.

THE COURT: Oh, in the morning?

[J.R.K.]: Yeah.

THE COURT: And then you said you started to feel refreshed and better. What changed?

[J.R.K.]: She stopped doing that.

THE COURT: So it was mainly her stopping drinking that made you feel better?

[J.R.K.]: Yeah. And also not being home alone, never being home alone anymore.

THE COURT: And you like that, obviously?

- 18 -

[J.R.K.]: Yeah.

*Id.* at 150-51.

After hearing from the Children, the trial court stated the following in open court:

> [The Children] completely validated all the things that [Father] said about you, [Mother], with respect to the drinking concerns. They thought that you were drinking when [J.R.K.] was on your lap. It made them scared. And you threw up outside of the vehicle, out the window of the car after picking them up from school. They were afraid. I found them to be very credible with what they were testifying with respect to your use of alcohol and concerns.
>
> I talked to [J.R.K.] regarding what happened with the situation in September [concerning the alleged suicidal statements], and he said that he felt that way because of how you were acting with the alcohol and not being at home. But he used the words, he now feels refreshed[,] because you've stopped doing those things.
>
> . . . [T]here was absolutely no reason why either one would be shading the truth or telling me lies about those things. They both care about you, and they care about [Father] a lot. . . .

*Id.* at 159-60.

In her testimony, Mother thereafter stated that she drinks socially and drank in front of the Children at parties. Mother stated that in 2017, she did vomit while driving, but maintained she was suffering from a medical condition at the time and was not drinking. *Id.* at 172. Mother testified that she no longer drinks when she has the Children. *Id.* at 203.

With respect to the incident in which she had J.R.K. steer her car, Mother testified that, while in her neighborhood:

- 19 -

[J.R.K.] asked if he could sit on my lap to drive, and I said okay. I was not drinking. He sat on my lap. I obviously had my hands on the steering wheel. I had my feet on the gas and the brake, and he was just sitting in my lap with my hands on the steering wheel and his hands on the steering wheel.

*Id.* at 198.

As to J.R.K.'s suicidal thoughts, Mother testified that on Labor Day weekend of 2019 J.R.K. "was crying[, and h]e was saying things like, [Mother], you don't like me, and . . . you're mad at me, and I don't have any friends and nobody likes me and just very negative things towards himself."

*Id.* at 205-06. She continued:

And then, finally, when he was done, I started to tell him just how amazing he was[,] and that I don't feel that way and just because maybe I got mad or was trying to discipline him for a situation doesn't mean I don't love him[,] and I think that he has the biggest heart of any little boy I know or any man that I know[,] and that people love him[,] and he has so many friends and — so just building him up and letting him know how I — how I feel about him as my son and as a person.

*Id.* at 206-07. Mother further stated:

I took what [J.R.K.] was saying very seriously. I know that . . . he's being honest and he's opening up to me. I thought I handled it really well. I thought we talked through it. I thought we were past it, and I felt we had a really great conversation.

*Id.* at 210-11.

As to the incident on September 14, 2019, on which J.R.K. made a suicidal gesture, Mother explained as follows:

[Mother]: I got out of the shower. I could hear that there was some yelling . . . . I didn't really know what was going on. I get out of the shower. I go downstairs and I go into the dining room and [J.R.K.]'s standing there[,] and he just looks really upset and

he starts to cry.  I gave him a hug.  Again he starts saying these things about, nobody likes him, that [J.A.K.]'s being so mean . . . .

[Mother's Counsel]: Did he tell you he doesn't think that you love him?

[Mother]: Doesn't think that I love him, just all these different emotions again were coming out again.  And so I'm again comforting him, talking to him, trying to figure out why he's saying all this stuff, what happened, and we have a great conversation again. . . .

[Mother's Counsel: [D]id you at any point hear that there was a knife, a pointing of anything at his chest?

[Mother]: No.

[Mother's Counsel]: Was [J.A.K.] anywhere around in that kitchen area that he would have seen [J.R.K.] pull a knife out of the drawer?

[Mother]: I have no idea.  I was in the shower.

[Mother's Counsel]: And did [J.A.K.] at any point say to you, Mom, he threatened to stab himself in the chest?

[Mother]: He did not say that.  And that really, really surprises me. . . .

*Id.* at 209–10.  Mother asserted that she was unaware that J.R.K. had possession of a knife until Father informed her of the incident following the visit to the emergency room.  *Id.* at 241-42.

After Mother testified, the trial court found as follows:

Mother testified that she no longer drinks while the Children are in her custody, and there is no evidence that Mother's current drinking habits pose a threat to the Children.  However, Mother's drinking has been problematic in the past[,] and the Children have stated that they have been scared because of Mother's drinking.  Mother was also inconsistent in parts of her testimony regarding how much she had to drink . . . at different times

- 21 -

Trial Ct. Op. at 8. The trial court further explained that it decided to maintain the shared custody schedule "based on the Children's best interest **at the time of the decision**. . . . [J.R.K.]'s mental health was the primary impetus for Father's petition for modification, and [J.R.K.] clearly expressed that he felt 'refreshed' now because of Mother's changed behaviors." Rule 1925(a) Op. at 7 (emphasis added).

Following our review, we discern no merit to Father's arguments that the trial court failed to consider the Children's testimony or improperly weighed the GAL report. Although the trial court stated that it did not regard the Children as fact witnesses regarding Mother's behaviors, it is apparent that the court weighed their testimony that was consistent with Father's allegations when considering their best interests. **See** N.T., 6/2/20, at 159-60. Nevertheless, the trial court credited Mother's testimony that she was not intoxicated when driving with the Children. Rule 1925(a) Op. at 4. Moreover, the trial court found that Mother recognized the concern her drinking caused the Children and was addressing that issue. Trial Ct. Op. at 8. In short, the trial court also considered the Children's and Mother's testimony that Mother's behaviors had improved during the pendency of Father's modification petition.

The trial court here was in the best position to observe the witnesses and determine the credibility of Mother's improvements to her behavior, and we must defer to the court's determinations regarding credibility and weight of the evidence in this regard. **See A.V.**, 87 A.3d at 820. Furthermore, the trial court was entitled to rely on the GAL's testimony and recommendations.

***See id.*** Because the testimonial evidence supports the court's findings, and its conclusions are reasonable in light of those findings, we discern no abuse of discretion. ***See King***, 889 A.2d at 632. Accordingly, Father's first four issues fail.

## Issue 5: Section 5328(a)(2)

Father next claims that the court abused its discretion pursuant to Section 5328(a)(2), the present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child. Father's Brief at 43. Specifically, Father argues that the court abused its discretion based on evidence of Mother's past excessive drinking habits and his allegation that Mother allowed J.R.K. to steer the car while she was intoxicated, which Father asserts placed the Children "in fear of imminent serious bodily injury" pursuant to 23 Pa.C.S. § 6102, which defines abuse. ***Id.*** at 45.

With respect to its findings regarding Section 5328(a)(2), the trial court stated in its Rule 1925(a) opinion that it "put substantial weight on the report and recommendation of the [GAL]." Rule 1925(a) Op. at 3. The trial court explained that the GAL "had the chance to meet with the Children and the parties multiple times between September 2019 and the hearing in June 20[20], and [the GAL] did not believe that what he was told about Mother's drinking by the Children or by Mother was cause for great concern." ***Id.*** at 3–4. Further, the trial court explained that

- 23 -

> Mother testified at the hearing and reported to [the GAL] that she had on more than one occasion allowed [J.R.K.] to sit on her lap and 'steer' the car in their neighborhood for short distances, while Mother retained control of the vehicle. There was no admissible evidence presented to support Father's allegations that Mother let [J.R.K.] steer the car for an extended period of time while she was intoxicated.

*Id.* at 4.

In addition, the court found relevant that the Children and Youth Agency (Agency) "screened out the report of [J.R.K.] 'steering' the car." *Id.* The trial court explained:

> After the pretrial video conference was held [with the parties] on April 27, 2020, the [trial] court reached out to the Agency to confirm whether the Children have been subjects of any indicated or founded report of child abuse, as required under 23 Pa.C.S. § 5329.1(a)(1). Based on information provided to the court by the Agency—as permitted under 23 Pa.C.S. § 6340(a)(5.1) [(Release of information in confidential reports.)]—the court determined that the report involving [J.R.K.]'s statements about his threatened suicide and the steering-the-car incident was investigated and screened out.

*Id.* The GAL further testified that the report to the Agency had been "screened out" and he was not aware of any Agency involvement with Mother. N.T., 6/2/20, at 46.

Following our review, the record supports the court's finding that there was no admissible evidence presented to prove "that Mother let [J.R.K.] steer the car for an extended period of time while she was intoxicated." Rule 1925(a) Op. at 4. As noted above, Mother testified that, while in her neighborhood, J.R.K. asked her to "drive" and she agreed. She denied being intoxicated and explained that she was in control of the vehicle at the time.

*See* N.T., 6/2/20, at 198. Further, the GAL noted Mother's account that "when in the neighborhood and near home of less than a mile, [Mother] has allowed [J.R.K.] to sit on her lap and 'steer' the car while confirming she is fully in control and indicates that this may occur a few times a year." *See* GAL Report, 4/15/20, at 4. Moreover, although the GAL indicated that he read the report in which J.R.K. stated that the incident scared him, the GAL suggested that he did not have "that same impression" from J.R.K. during his interview. *See* N.T., 6/2/20, at 21. We defer to the trial court's credibility determination in favor of Mother in this regard and discern no abuse of discretion. *See A.V.*, 87 A.3d at 820.

## Issue 6: Section 5328(a)(6)

In his next issue, Father argues that the court abused its discretion regarding Section 5328(a)(6), the child's sibling relationships, which it found slightly favors Father. Father's Brief at 48. The record supports the court's finding to the extent the Children have a half-brother, then thirteen months old. The Children have no half-siblings from Mother. We discern no abuse of discretion by the court maintaining the equally shared physical custody schedule between the parties, which provides the Children reasonable time with their half-brother. *See A.V.*, 87 A.3d at 820.

## Issue 7: Section 5328(a)(7)

Father also argues that the court abused its discretion with respect to Section 5328(a)(7), the well-reasoned preference of the child, considering the child's maturity and judgment. Father notes that J.A.K stated a preference to

- 25 -

spend more time with Father, that J.A.K disliked spending time at Mother's home, and that J.A.K. testified to his concerns regarding Mother's drinking and her risky behaviors with J.R.K. Father's Brief at 49. Father acknowledged that J.R.K. preferred to maintain the shared custody schedule already in place, but asserts that his preferences are not as well reasoned as J.A.K.'s. *Id.* at 50. Father notes that J.A.K. is older and more mature than J.R.K. and that J.R.K. expressed concerns of not being a source of conflict between Mother and Father. *Id.* Father therefore contends that the trial court erred in "not analyzing the weight that should be afforded" to J.A.K. *Id.* at 51.

With respect to Section 5328(a)(7), this Court has explained as follows:

> Although the express wishes of a child are not controlling in custody decisions, such wishes do constitute an important factor that must be carefully considered in determining the child's best interest. The weight to be attributed to a child's testimony can best be determined by the judge before whom the child appears. The child's preference must be based upon good reasons and his or her maturity and intelligence must also be considered.

*Ketterer*, 902 A.2d at 540 (citations and quotation marks omitted).

Here, in its opinion accompanying the subject order, the trial court found:

> Both Children enjoy spending time with both parents. [J.A.K.] would prefer to spend some more time with Father but did not have a clear idea of what this would look like. [J.R.K.] is happy with the current custody schedule. The Children do not want to be separated from each other.

Trial Ct. Op. at 6.

In its Rule 1925(a) opinion, the trial court further explained:

[J.A.K.] did not state that "he wished to live with Father," but that he would "like to spend more time with Father." [J.A.K.]'s preference was based on feeling more engaged at Father's house than at Mother's house, stating that the current schedule is "good" but Father interacts with them more, and [J.A.K.] is more likely to want to participate when Father asks him if he wants to do something than when Mother asks him if he wants to do something. [J.R.K.]'s clearly expressed preference was that he does not want the current custody schedule to change and that he no longer feels bad at Mother's house. Both [of the C]hildren clearly expressed the preference to stay together. On balance, the Children's "well-reasoned opinions" did not weigh meaningfully in either party's favor.

Rule 1925(a) Op. at 5.

Following our review, we conclude the court carefully and thoroughly considered the Children's well-reasoned preferences pursuant to Section 5328(a)(7), and we discern no abuse of discretion. *See A.V.*, 87 A.3d at 820; *Ketterer*, 902 A.2d at 540.

## Issue 8: Section 5328(a)(8)

In his eighth issue, Father argues that the court abused its discretion pursuant to Section 5328(a)(8), the attempts of a parent to turn the child against the other parent. Father's Brief at 51. Specifically, Father argues that the court failed to weigh the following testimony of J.A.K.:

THE COURT: Do you ever get in trouble at [Mother]'s?

[J.A.K.]: Well, I got mad at my brother one time. And I was just sitting up in my room, [Mother] came to talk to me. But then she ended up screaming in my face even though I was telling her to stop.

THE COURT: How long ago was that?

[J.A.K.]: A couple weeks ago.

- 27 -

THE COURT: What was the problem? . . .

[J.A.K.]: Because I—I forget what I did. But I was up in my room, and she came in and said let's have a talk. And then she said, I don't want another [Father] running around this house because of, like, my anger, which I really don't think I have serious anger problems. And then she started screaming in my face about how, like, [Father's father] was the same way and, like, [Father's mother] wasn't there. So I told her to stop, and she just kept yelling in my face about it.

N.T., 6/2/20, at 128.

Father asserts that there was another incident in which he was dropping off a video game to Children at Mother's house. Father's Brief at 52. According to Father, Mother "slammed the door in [his] face and screamed for Children to not say hello [to] Father."[4] *Id.* at 50 (citing N.T., 6/2/20, at 93).

Mother described the argument with J.A.K. as follows:

[Mother]: We weren't agreeing. And he was being extremely disrespectful to me and yelling at me, and I was trying to stay calm and talk him through things. And we were just going back and forth at each other, and I was getting really frustrated. He

_____

[4] We note that Father's argument in his brief overstates his testimony of the incident around the video game. Specifically, at the hearing, Father testified that:

[J.A.K.] came to the door and opened the door. And I asked him to give me a hug, and he briefly stepped out and gave me a hug. I said hi to [J.R.K.]. And instantly [Mother] goes, no, no, that's enough. That's it. Shut the door. That's enough.

The door was shut. [J.A.K.] opened door about 15 seconds later and sheepishly came out and said, sorry, I have to go. I could see that [J.R.K.] was laying right there on the ground playing a game.

N.T., 6/2/20, at 93. We add that Father testified this interaction occurred on the day of a hearing to "get alimony removed from the support order." *Id.*

was, too. And he stormed out of the house, got on his bike, and went for a bike ride.

[Mother's Counsel]: And did you say something about him being just like [Father]?

[Mother]: I don't know if those were my exact words.

*     *     *

. . . I believe the comment that I made was, you are exactly like [Father], and this is why we're having this situation.

[Mother's Counsel]: And was this something of substance, this argument?

[Mother]: No. It was—to be honest, I just think it was a normal parent/kid argument that occurs during COVID when you're living in a house five days straight and you want them to do their work and they don't want to and they don't want to get on the iPad to do their school work and I'm trying to do my work at the house and he wants to get on the Xbox and his friend isn't doing this. I just think it was a lot of built-up feelings in the last ten weeks, and it just happened.

N.T., 6/2/20, at 243. Mother did not testify regarding the incident surrounding the video game that Father described.

Instantly, we note that the trial court, after hearing J.A.K.'s account of the argument, but before Mother testified, stated, "[J.A.K.] did tell me about one time not too long ago where he felt really uncomfortable with you, [Mother], you accusing him of being like [Father], yelling at him . . . ." *Id.* at 160. Nevertheless, in considering Section 5328(a)(8), the trial court ultimately found "no evidence that either party disparages the other in the presence of the Children, or tries to turn them against the other parent." Trial Ct. Op. at 6. In light of the isolated incidents, and Mother's explanation of her argument with J.A.K., we discern no abuse of discretion in the trial court's

overall finding. ***See A.V.***, 87 A.3d at 820. Accordingly, Father's eighth issue fails.

## Issue 9: Section 5328(a)(13)

Father argues that the court committed an abuse of discretion with respect to Section 5328(a)(13), the level of conflict between the parties and the willingness and ability of the parties to cooperate with one another, which the court weighed in favor of neither party. Father's Brief at 52. Specifically, Father asserts that Mother failed to inform him of J.R.K.'s alleged suicidal ideations in September of 2019. ***Id.*** Rather, Father asserts that he learned of the same from J.A.K., the older child. Father adds that he testified as to an incident when Mother removed J.A.K. from a baseball tournament without communicating with him and that Mother hangs up the phone on him. ***Id.*** Father further notes that the GAL noted that he and Mother do not communicate well. ***Id.*** Therefore, Father argues that the evidence does not support the weight placed by the court on this factor.

With respect to Section 5328(a)(13), the trial court found as follows:

> The parties have some issues with communication as noted by [the GAL], including misinterpretation of what the other says and unwillingness to compromise. Overall, however, the parties communicate and cooperate frequently and to a relatively high degree, and the court encourages them to build on the foundation they have. The parties are both talented and accomplished individuals who have a tremendous amount to offer [the] Children. Father and Mother need to work together in good faith to improve their communication. . . .

Trial Ct. Op. at 7-8.

Following our review, we conclude that the trial court's findings are supported by the record. Specifically, the GAL testified on cross-examination by Mother's counsel that he recommended maintaining shared physical custody between the parties for the following reason, in part:

> [Mother's Counsel]: And you would agree that if one parent has more custodial time, there is a higher burden of . . . sharing of information that that parent . . . would certainly inherit?
>
> [GAL]: [Y]es. . . .
>
> [Mother's Counsel]: And . . . you were concerned that if either of these parents have more time than the other, the loss of communication about the [C]hildren was a concern to you?
>
> [GAL]: Yes. And it's not necessarily because they don't communicate with each other. It's how they communicate with each other and how they each perceive those communications. So loss of time results in . . . loss of involvement [with the Children].

N.T., 6/2/20, at 48.

With respect to Father's claim regarding Mother's failure to inform Father of J.R.K.'s suicidal ideations, the trial court, as noted above, heard Mother's testimony that while Mother was aware that J.R.K. was having difficulties, she was unaware that he held a knife to his chest. *See id.* at 209-10.

Accordingly, we discern no abuse of discretion in the trial court's decision regarding the communications between Mother and Father. In addition to the trial court's observation of J.R.K. and Mother during the hearing, the court also heard testimony from the GAL that both Father and Mother "were concerned and would take whatever steps were necessary to

ensure the safety of the [C]hildren." *Id.* at 45. Therefore, we do not disturb the court's findings with respect to Section 5328(a)(13). *See A.V.*, 87 A.3d at 820.

### Issue 10: Section 5328(a)(14)

Father argues that the trial court abused its discretion with respect to Section 5328(a)(14), the history of drug or alcohol abuse of a party, in concluding that the factor was neutral between the parties. Father, similar to his first four issues, contends that the trial court ignored the Children's testimony about the "incidents" of drunk driving and failed to properly weigh the egregiousness of the evidence that Mother vomited on one occasion and allowed J.R.K. to steer the vehicle. Father's Brief at 40. Father adds the Children did not testify to concerns "about any drinking at Father's home." *Id.* at 41.

As noted above, the trial court considered the Children's testimony regarding Mother's behavior involving drinking, but found that Mother was addressing this issue during the pendency of Father's modification petition. We defer to the court's determinations regarding credibility and weight of the evidence in this regard. *See A.V.*, 87 A.3d at 820. Because the testimonial evidence supports the court's findings, and its conclusions are reasonable in light of those findings, we discern no abuse of discretion.

### Issue 11: Section 5328(a)(4), (9), (10), (12)

Father next claims that the trial court erred in considering what he terms as "the 'stability factors'" as favoring neither party. Father's Brief at 45.

Father notes that the trial court found that the Children were doing well under the current custody schedule and that both parties were likely to attend to the Children's daily needs. *Id.* Father emphasizes several of the arguments raised above and adds there was evidence that Mother left Children home alone, that J.R.K.'s grades dropped, that J.A.K. testified that Mother provided less activity and supervision for the Children, and that she failed to ensure the Children were present for extracurricular sports. *Id.* at 46-47. Father further notes that Mother, after initially denying doing so, admitted to leaving the Children home alone immediately after J.R.K. made a suicidal gesture. *Id.* at 46.

Instantly, the trial court credited Mother's testimony that she sometimes leaves the Children home alone for short periods of time. However, the court found that this "would have been more of a concern in 2018 than it is now. Because the Children are now old[er] and mature enough to be safely left alone for short periods of time, this factor does not favor either party." Trial Ct. Op. at 7.

The record supports the trial court's findings. J.R.K. testified that Mother had stopped leaving the Children home alone for social outings, and Mother testified that she will be present for the Children when they are in her custody. N.T., 6/2/20, at 150–51; *see also id.* at 239 (Mother testified on direct examination that she does not "have a problem with" abiding by the Children's wishes that she be present when they are in her custody.). Further, because J.A.K. was twelve years old, and J.R.K. was ten years old at the time

of the hearing, the trial court's decision to weigh Section 5328(a)(12) in favor of neither party was reasonable. Accordingly, we discern no abuse of discretion by the trial court in maintaining the shared physical custody award between the parties. *See A.V.*, 87 A.3d at 820.

### Issue 12: The No-Alcohol Provision

Father argues that the trial court abused its discretion in placing a "no alcohol" condition on him when there was no evidence that Father consumes alcohol in excess. Father's Brief at 42. Father contends that the trial court is essentially sanctioning him, when the only record evidence was that Mother's alcohol use was problematic for the Children. *Id.* at 42-43.

In response, Mother does not contest the no-alcohol provision. Mother instead asserts that the trial court properly extended the provision to Father because "Father's primary argument as to why he should have been awarded primary physical custody revolved around [her] alleged alcohol abuse." Mother's Brief at 31. Mother continues, "It would only be appropriate for the [t]rial [c]ourt to ensure no parental drinking around the [C]hildren." *Id.*

The trial court found that "Mother's drinking has been problematic in the past[,] and the Children have stated that they have been scared because of Mother's drinking." Trial Ct. Op. at 8. As to Father, the trial court noted only that "Father said he rarely drinks alcohol when he has custody of the Children." *Id.* In its Rule 1925(a) opinion, the trial court explained its decision to impose a no-alcohol provision on both Mother and Father by noting "the Children

would feel safer if they know that neither of the parents is drinking alcohol while the Children are at their house." Rule 1925(a) Op., 8/6/20, at 3.

Following our review, we are constrained to conclude that the trial court's explanation lacks support in the record. It appears that Mother and Father's use of alcohol had been an issue between Mother and Father in prior proceedings. Nevertheless, the trial court did not issue a no-alcohol provision for either party based on the prior proceedings.

At the instant hearing on Father's petition to modify the existing custody arrangement, and as detailed previously, the Children testified to their concerns regarding Mother's drinking. Mother, through cross-examination of Father and in her own testimony, attempted to raise concerns Children had with Father's use of alcohol. Father, however, adamantly denied drinking to excess in front of Children. Moreover, when Father asked the GAL if the Children mentioned any "feeling that [Father drank] too much[,]" the GAL responded, "I don't believe they raised that, no." N.T., 6/2/20, at 31. When examining the Children *in camera*, the trial court did not ask J.A.K. about Father's drinking, and J.A.K. volunteered no testimony on that topic. When the trial court asked J.R.K. whether he was concerned about anyone drinking at Father's home, J.R.K. stated, "No." **Id.** at 151. The trial court made no further findings regarding the Children's concerns about Father's drinking, or the credibility of Father's testimony that he rarely drank alcohol when exercising custody of Children. **See** Rule 1925(a) Op. at 3; Trial Ct. Op. at 8.

Based on the forgoing, we conclude that the record and the trial court's findings lack any indication that the Father's drinking posed any concern for or risk to the Children. Therefore, the trial court's determination that the Children "would feel safer" if neither parent drank alcohol while exercising custody of the Children is not binding on this Court. **See A.V.**, 87 A.3d at 820. Accordingly, we agree with Father that the imposition of a no-alcohol provision on him constitutes an abuse of discretion, and we vacate that portion of the present custody order, specifically, Paragraph VI(A), to the extent that it applies the no-alcohol provision to Father.[5]

### Issue 13: Error or Abuse of Discretion in Ordering Shared Custody

In his final issue, Father contends that the trial court erred or abused its discretion. Father's Brief at 38-39. For the reasons stated herein, we have found no merit to Father's previous arguments. Based on this record, we find no abuse of discretion in the trial court's decision to maintain the shared custody schedule.

To summarize, we conclude that the trial court did not ignore the testimony regarding Mother's abuse of alcohol and several incidents that prompted Father to file the instant petition to modify custody. Further, the trial court did not abuse its discretion by crediting Mother's testimony concerning her efforts to address these challenges. Additionally, the trial court did not abuse its discretion in concluding that Children's best interests would

---

[5] Our decision does not affect the application of Paragraph VI(A) to Mother.

be served by a shared custody arrangement because its conclusions are supported by the record. It is not the role of this Court to substitute its judgments for the findings and conclusions of the trial court that have support in the record. For these reasons, we have no basis to disturb the trial court's rulings and affirm the trial court's decision. *See A.V.*, 87 A.3d at 820.

## Conclusion

For the foregoing reasons, we vacate only that portion of Paragraph VI(A) of the June 12, 2020 custody order that applied the no-alcohol provision to Father. We otherwise affirm the order denying Father's petition to modify custody.

Order affirmed in part. Paragraph VI(A) vacated in part. Jurisdiction relinquished.

Judge Strassburger did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/13/2021